977 F.2d 1114
 7 IER Cases 1423
 Cheryl R. CHURCHILL and Thomas Koch, M.D., Plaintiffs-Appellants,
v.
Cynthia WATERS, Kathleen Davis, Stephen Hopper, and
McDonough District Hospital, an Illinois municipal
corporation, Defendants-Appellees.
 No. 91-2288.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 14, 1992.
Decided Oct. 15, 1992.
As Amended Oct. 16, 1992.
Rehearing and Rehearing In Banc
Denied Dec. 9, 1992.
 
 John H. Bisbee (argued), Macomb, Ill., for plaintiffs-appellants.
 Donald J. McNeil, Laurie A. Spieler, Larry Manson (argued), Brian J. Fahey, Dorothy J. Voss, Keck, Mahin & Cate, Chicago, Ill., Janet L. Jannusch, Keck, Mahin & Cate, Peoria, Ill., for defendants-appellees.
 Before CUDAHY, COFFEY, and MANION, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Cheryl R. Churchill appeals the district court's entry of summary judgment against her claim that the defendants fired her because she spoke out on a matter of public concern, namely the reduced quality of nursing care in the hospital's obstetrics department as a result of a recently instituted cross-training program. Because we hold that Churchill's speech is a matter of public concern when viewed in the light most favorable to the plaintiff Churchill (as we review the entry of summary judgment), we reverse.
 
 I. FACTS
 
 2
 McDonough District Hospital in Macomb, Illinois hired Cheryl Churchill as a part-time nurse in the obstetrics department on October 25, 1982. Churchill began working full time on September 16, 1985 and continued on full time status until her discharge on January 27, 1987. Churchill's performance evaluations received every six months during her employment demonstrated steady improvement through the December 1985 evaluation, and at this time the ratings improved to above standard performance or standard in every category. Churchill's June 1986 performance evaluation took a nose dive when Cynthia Waters, Churchill's supervisor, rated her performance as below standard in three of some fifty rating categories. But on the next six month's performance review in December 1986, Churchill once again received ratings of above standard or standard performance in every area.
 
 
 3
 Churchill's comments about her view of her job in the space provided on the evaluation forms for employee comments reflect her to be a cheerful employee who was enjoying her work through the December 1985 evaluation. Indeed, in the additional evaluator's comments on the December 1985 evaluation, Waters stated that "Cheryl has a very bubbly contagious sense of humor most times." But in spite of rating Churchill's performance as above standard or standard in every category on the December 1986 evaluation, Waters noted that Churchill "exhibits negative behavior towards me and my leadership through her actions and body language...." Waters discharged Churchill less than two months after making these critical comments on an otherwise positive evaluation. Churchill alleges that the breakdown in relations between herself and Waters was the result of Waters' displeasure with her opposition to the hospital's improper implementation of a nurse cross-training program, which Churchill was convinced was detrimental to the welfare of patients in the obstetrical ward, as well as Waters' hostility toward her concerning her association with Dr. Koch, who like Churchill had been subjected to Waters' animosity. In this review of a summary judgment against Churchill, we accept her version of events as true to the extent supported by the record or reasonable inferences therefrom.
 
 
 4
 In April of 1986 defendant Kathy Davis was hired as the hospital's vice president for nursing. Davis initiated a nurse staffing policy called "cross training," which involved transferring nurses to work in departments other than those in which they were trained and to which they were ordinarily assigned. Churchill objected to the cross-training program not as a matter of policy but on the ground that the cross-training was being implemented improperly, for rather than being assigned to a department for an organized training program on a regular schedule, nurses were assigned to other departments (e.g. nurse from orthopedics transferred to obstetrics) for "cross training" only when their respective departments were over staffed vis-a-vis the nurse-patient ratio in the particular discipline. Churchill felt that this cross-training procedure as implemented created a serious problem, for nurses would be inadequately trained and ill prepared to perform in the areas where they were only sporadically assigned. Furthermore, sending uneducated and untrained nurses into an unfamiliar discipline often distracted the regular nurses from their appointed tasks, thereby interfering with proper patient care and thus endangering patients. Churchill allegedly incurred the wrath of Waters and Davis through her vocal criticism of the type of cross-training program utilized.
 
 
 5
 Churchill asserts that she inadvertently aroused additional antagonism from the hospital administration through her association with Dr. Thomas Koch, the clinical head of the obstetrics ward, who was likewise outspoken in his opposition to the hospital's implementation of the cross-training program. According to Churchill, Dr. Koch initially incited the hospital administration's animosity in 1982 when he blamed inadequate nurse staffing in the obstetrics department for the birth of a stillborn baby.[1] Prior to the incident of the stillborn baby, Koch had notified Waters that he believed the obstetric ward was understaffed, but it was not until after the near-fatal birth (resulting in brain damage to the infant) that the hospital agreed to provide additional staffing. Dr. Koch's battle with the hospital administration over nurse staffing policy continued through his opposition in 1986 to the cross-training program. By the summer of 1986, Churchill and Koch had become social friends (subsequently married in 1991), and the hospital administration perceived them as professional allies. Churchill's association with Koch allegedly offended the hospital administration, for she was able to provide him with information that he would otherwise not have had concerning the assignment of inexperienced nursing personnel to the staff in the obstetrics area. This in turn supplied him with ammunition for his campaign for improved and acceptable nursing care. By August of 1986, it became apparent that the hospital administrators were keeping files of criticisms rendered by Waters and Davis about Koch.
 
 
 6
 On August 21, 1986, a "code pink"[2] medical emergency occurred during a cesarean section procedure. When Churchill responded to the code pink, Dr. Koch instructed her to assist him with the emergency C-section.[3] Churchill assisted Dr. Koch until the C-section was completed and the baby was successfully delivered, at which time she excused herself in order that she might check on another patient who was in the early stages of labor. Upon determining that her other patient was not in need of immediate attention, Churchill returned to the delivery room and began documenting in the patient's record the various medical and surgical procedures used during the delivery. Shortly thereafter Waters, who entered the delivery room while Churchill was checking on her other patient, called Churchill from across the room and ordered her to check on her patient. Churchill in responding stated that she had just checked the patient and said: "you don't need to tell me what to do." Churchill thereupon returned to her patient as instructed even though she had not completed her patient record entries. Dr. Koch was furious with Waters for interfering with his operation and attempted to talk with her after completing the surgery, but she refused to discuss the matter with him alone. Waters called Stephen Hopper, the hospital's chief executive officer, and thereafter Waters, Koch and Hopper met to discuss the incident. The following day Hopper and Waters met with Davis and the administrative head of obstetrics to discuss Dr. Koch's complaints[4] and to decide how to deal with Churchill's response to Waters in the delivery room during the code pink procedure. They decided to issue Churchill a "written warning"[5] for insubordination because of her comment "[y]ou don't have to tell me how to do my job."
 
 
 7
 The relationship between Churchill and Waters apparently continued to deteriorate throughout the fall of 1986, as Churchill's December 1986 evaluation included critical comments for the first time. In the evaluation Waters commented that Churchill's attitude toward her "promotes an unpleasant atmosphere and hinders constructive communication and cooperation." At the time of Churchill's discharge, the hospital administration decided to regard Waters' critical comments as a second "written warning."
 
 
 8
 The incident that directly led to Churchill's dismissal was her January 16, 1987 break-room conversation with a cross-trainee, Melanie Perkins-Graham, and Dr. Koch. According to Churchill's version of the occurrence, "practically the entire conversation related to cross-training and inadequate staffing, pulling of staff. The entire conversation almost, the majority of it consisted of speaking into [sic] terms of patient care and our concerns regarding that." In her deposition Churchill admitted that she said that if Davis' staffing policies were unchanged, Davis would ruin the hospital because "her administrative decisions seemed to be impeding nursing care." But she stated that when Perkins-Graham expressed reservations about transferring to obstetrics because of Waters' reputation throughout the hospital of being difficult to work with, she (Churchill) said that should not affect Perkins-Graham's decision because Waters was just doing her job. Churchill asserts that she encouraged Perkins-Graham to consider transferring to obstetrics full time and denied having engaged in personal criticism of Davis or Waters during that conversation. Mary Lou Ballew, another nurse who allegedly overheard only portions of the conversation, reported to Waters that Churchill took "the cross trainee into the kitchen for a period of at least 20 minutes to talk about you and how bad things are in OB in general." As a result of Ballew's report, Waters and Davis met with Perkins-Graham to discuss the conversation she had with Churchill. According to Davis' notes of the meeting, Perkins-Graham
 
 
 9
 "stated that Cheryl had indeed said unkind and inappropriate negative things about Cindy Waters. She went on to say that Cheryl was not quiet about it and had assured her that I [Davis] had complete knowledge of everything she was saying because had said it to my face. She explained that Cheryl had discussed her evaluation quite a bit. She stated that C. Waters had wanted to wipe the slate clean and have things get better but this wasn't possible. She also stated that just in general things were not good in OB and hospital administration was responsible. Kathy Davis' name had also come up in the conversation and Cheryl had stated that Kathy was ruining [the hospital].... By the end of the conversation [Perkins-Graham] was stating that she knew we could not tolerate that kind of negativism."
 
 
 10
 Waters and Davis did not question Churchill about the conversation, nor did they question Dr. Koch or another nurse who overheard the conversation, Jean Welty, both of whom have made it clear that they would have supported Churchill's version of the incident.
 
 
 11
 As soon as Davis heard about Churchill's conversation with Perkins-Graham, she decided to fire Churchill. But since she did not feel that she had the authority to terminate Churchill on her own, she bucked the decision up to Hopper. At a meeting on January 26, 1987, Waters, Davis, Hopper and the personnel director of the hospital, Bernice Magin, agreed to terminate Churchill's services. When Churchill arrived for work on January 27, 1987, Waters met her at the door of the obstetrics department and requested that Churchill accompany her to Davis' office. According to Churchill's notes from the meeting, Davis informed her in the presence of Waters that
 
 
 12
 "it had recently been brought to her attention that I was continuing to exhibit negative behavior in the department, and that I had been reported by someone to have had a conversation lasting fifteen to twenty minutes with a cross trainee who had been assigned to OB for a particular evening shift. [Kathy Davis] declined to identify the date of the incident, or the name of the person with whom I was supposed to have talked even though I asked her. She replied by telling me that my conversation was reported as being non-supportive of the department and of its administrative leadership. Because of that, she said, 'We are going to have to terminate you.' "
 
 
 13
 Davis informed Churchill that the decision to terminate her was final, and that her only recourse was to talk with Hopper about it. Believing that Hopper, the Hospital C.E.O., would be fair and impartial and being unaware of the fact that he was involved in the decision to terminate her (including participating in the process of preparing the record to justify the termination), Churchill appealed the discharge to him. On February 6, 1987 Churchill met with Hopper and Magin in what turned out to be a star-chamber proceeding. In her handwritten notes of the meeting, Churchill stated that Hopper made clear that the discussion would be limited to a) the written warning she received, b) the negative comments on her December 1986 evaluation and c) the incident when she criticized Waters and Davis to an unidentified cross trainee in obstetrics one evening (Hopper did not inform her when the conversation took place). Hopper asked her specific questions about the written warning as well as the negative comments on her latest evaluation, but when she attempted to raise the issues she allegedly discussed with Perkins-Graham regarding the inadequacies of the cross-training program, Hopper "said he didn't want to get into that...." In a letter dated February 12, 1987, Hopper informed Churchill that her termination was final:
 
 
 14
 "In view of the seriousness of the latest reported incident and the fact that you previously received a written warning on August 25, 1986, as well as continued written counseling on your January 5, 1987 performance appraisal, I find that the decision to terminate your employment at McDonough District Hospital was appropriate."
 
 
 15
 Churchill filed her complaint in the federal district court in Peoria, Illinois pursuant to 42 U.S.C. § 1983 alleging that in terminating her, the defendants violated her First Amendment right to free speech as well as her right to freedom of expressive association with Dr. Koch. After the preliminary skirmishes and the district court's partial grant of the defendant's first motion for summary judgment, see Churchill v. Waters, 731 F.Supp. 311 (C.D.Ill.1990), Churchill moved for limited summary judgment on her free speech claim on the ground that the defendants violated her First Amendment due process rights in that they discharged her because of her speech regarding a matter of public concern (namely substandard implementation of cross training) without determining whether she was engaged in protected speech. The defendants moved to dismiss Churchill's freedom of expressive association claim for a failure to state a claim upon which relief could be granted, and for summary judgment on her free speech claims, on the ground that the speech was not protected speech, and even if it were, the defendants did not fire her for speaking out on a matter of public concern but for undermining the authority of the hospital administration. The district court a) dismissed Churchill's freedom of association claims for failure to state a claim upon which relief can be granted; b) entered summary judgment on behalf of the defendants on Churchill's free speech claim, holding that Churchill's statements were not protected speech as a matter of law, and even if they were, the hospital's interest in maintaining harmony among the workers and encouraging good working relationships among the employees and supervisors outweighed Churchill's interest in expressing her opposition to the cross-training policy to her co-worker; and c) denied Churchill's motion for partial summary judgment on her First Amendment due process claim without discussion.
 
 II. ISSUES
 
 16
 The issues on appeal are: 1) whether the district court inappropriately resolved material issues of fact against Churchill in holding that her speech was not a matter of public concern; 2) whether the defendants' failure to determine whether Churchill's conversation with Perkins-Graham was on a matter of public concern violated Churchill's First Amendment due process rights; and 3) whether the individual defendants are entitled to qualified immunity from Churchill's § 1983 claims.[6]
 
 III. MATTER OF PUBLIC CONCERN
 
 17
 The defendants admit that they fired Churchill because of her conversation with Perkins-Graham on January 16, 1987, but they contend that the district court was correct in holding that Churchill's conversation was not protected under the First Amendment. Churchill argues that the district court's holding that her speech was not protected was erroneous because the judge resolved genuine issues of material fact adversely to her in granting the defendants' motion for summary judgment. We agree. Public employees may not "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operations of the public [entity] in which they work." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Furthermore, "a public employee [does not forfeit her] protection against governmental abridgement of freedom of speech if [s]he decides to express [her] views privately rather than publicly." Greenberg v. Kmetko, 840 F.2d 467, 472 (7th Cir.1988) (quoting Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979)). But in order for Churchill's speech to be protected, it must be capable of being "fairly characterized as constituting speech on a matter of public concern[; otherwise] it is unnecessary for us to scrutinize the reasons for her discharge." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). While we review the entire record in order to determine whether Churchill's speech is a matter of public concern, see id. at 147-48, 103 S.Ct. at 1690, we may not resolve disputed issues of fact in order to come to a conclusion in our review of the district court's grant of summary judgment. See Fed.R.Civ.P. 56(c). The status of Churchill's speech is a question of law, see Phares v. Gustafsson, 856 F.2d 1003, 1007 (7th Cir.1988), but in this case, where the content of the speech is in dispute, the substance of the speech is a question of fact for the jury to resolve. "In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)." Beard v. Whitley County, REMC, 840 F.2d 405, 409-10 (7th Cir.1988). After reviewing the record and considering all reasonable inferences therefrom in the light most favorable to Churchill, it is evident that the District Court's grant of summary judgment was in error, for according to Churchill's version of her statements, she was speaking out on improper nurse staffing policies at McDonough District Hospital that endangered the quality of patient care, an issue that is most certainly a matter of public concern.
 
 
 18
 "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690. We have previously "recognized that content is the greatest single factor in the Connick inquiry." Berg v. Hunter, 854 F.2d 238, 243 (7th Cir.1988). Churchill's deposition version of the January 16, 1987 conversation was that "practically the entire conversation related to cross training and inadequate staffing, pulling of staff. The entire conversation almost, the majority of it consisted of speaking into [sic] terms of patient care and our concerns regarding that." Churchill stated that it was her recollection that she said the cross-training program
 
 
 19
 "wasn't fair to patients because when a nurse was in to take of a patient or anyone who goes in to take care of a patient, that patient assumes that that person who is delivering health care to them is knowledgeable and knows what they are doing. They expect them to be able to care for them in a routine fashion and also to be knowledgeable enough to administer care to them should an emergency develop."
 
 
 20
 Churchill recalled that during the conversation, she, Perkins-Graham and Koch agreed
 
 
 21
 "that cross-training could be useful but only if it was implemented with properly structured teaching and a regular frequent exposure to the department. In other words, you could not use a specialty area or really any area of the hospital, I don't think, to just send nurses there so they wouldn't have to go home on a low census day so that they could make money rather than go home without making any money."
 
 
 22
 In discussing what she believed to be inadequate staffing, Churchill allegedly said that she believed patients were at risk because there were not enough nurses. Churchill further related that she discussed the hospital's violation of state regulations with Perkins-Graham:
 
 
 23
 "I mentioned that there is a regulation and it's contrary to pulling people from OB to go to another area of the hospital to work and then come back because once you're assigned to the obstetrical department, you're to be assigned there for the entire evening. If you leave, you are not to come back. They, they being administration I suppose, I don't know where the policy came from, they got around that by saying that the person when returning from another area of the hospital would have to shower and change clothes, but that requires time, five, ten minutes, which if you have got a real emergency going, you don't have five or ten minutes for that."
 
 
 24
 In her complaint, Churchill alleged that during the conversation, she
 
 
 25
 "charged that the Defendants WATERS and DAVIS ineffectively administered the nursing function of said Hospital, in particular the Obstetric Wing thereof, with respect to the duties, powers, and mission of the Hospital to discharge its responsibility to provide cost effective, high-quality health care services and products embracing all of the patients' needs, to improve patient care through 'state of the art' health care delivery systems, and to maintain an environment inspiring creative approaches by the medical and nursing staffs to complex health care challenges."
 
 
 26
 Accepting Churchill's version of the conversation as true (Dr. Koch as well as nurse Welty, who overheard the conversation, corroborated Churchill's version), she was undoubtedly speaking about a matter of public concern. There can be no doubt that when questioning the hospital's violation of state nursing regulations as well as the quality and level of nursing care it provides its patients, the nurse is speaking about matters of public concern. See Frazier v. King, 873 F.2d 820, 825 (5th Cir.1989). Furthermore, accepting Churchill's description of the cross-training program as accurate, we are concerned whether the hospital's implementation of cross-training actually complies with the accreditation standards promulgated by the Joint Commission on Accreditation of Healthcare Organizations.[7] A hospital that is well qualified for accreditation must assign clinical responsibilities in accordance with "the complexity and dynamics of the condition of each patient to whom the individual is to provide services and the complexity of the assessment required by each patient...." Accreditation Manual for Hospitals, NC.2.1.2.2 (1992). In order to be competent to fulfill their assigned responsibilities,
 
 
 27
 "[n]ursing staff members [should] participate in orientation, regularly scheduled staff meetings, and ongoing education designed to improve their competence.
 
 
 28
 ....
 
 
 29
 NC.2.3.3 If a nursing staff member is assigned to more than one type of nursing unit or patient, the staff member [must be] competent to provide nursing care to patients in each unit and/or to each type of patient.
 
 
 30
 NC.2.3.3.1 Adequate and timely orientation and cross-training [must be] provided as needed.
 
 
 31
 NC.2.3 (emphasis added). The record seems to indicate that in the hospital's implementation of cross-training, it neither assured that each cross trainee was "competent to provide nursing care to patients in each unit" nor provided "[a]dequate and timely orientation." From our review of the record, the cross-training program provided very little, if any, education or training to prepare cross trainees for dealing with the complexities and dynamics of patient care in obstetrics. Churchill asserts that nurses untrained in the specialty of obstetrics were sent to OB on an unscheduled basis (in order to avoid sending them home when their departments were over staffed) to follow the regular obstetric nurses around. This is contrary to the assumption in the accreditation manual that in a well-managed hospital environment, "[n]ursing department/service assignments in the provision of nursing care are commensurate with the qualifications of nursing personnel and are designed to meet the nursing care of patients." NR.4 (emphasis added). As Churchill alleges, McDonough District Hospital's cross-training policy appears to have been implemented merely to meet the bottom-dollar concerns of the hospital administration rather than the "nursing care of patients." We are not about to criticize a hospital administration for running a cost-efficient medical facility; however, we have serious reservations about the questionable practice of transferring nurses from one discipline to another without adequate education and training, thus possibly jeopardizing the health and welfare of its patients, and thereafter discharging an employee who properly points out the problems with the cross-training policy as implemented. In these days of highly technical medical procedures such as in vitro fertilization, obstetric and gynecological surgery (cancer), orthopedic surgery (hand, knee, leg), spinal surgery, cardiovascular surgery, ophthalmological surgery (detached retina) and heart, kidney, pancreas and liver transplants, nurses require specialized training before they are assigned to new areas. The failure to properly educate and train nurses in such highly specialized areas is most assuredly a matter of public concern.[8] Since Churchill's version of her conversation with Perkins-Graham (alleging that she was discussing this crucial matter of public concern) stands in stark contrast to the versions reported by Mary Lou Ballew and Perkins-Graham (who described the conversation as a "bitch session"), the content of the speech is a question of fact for the jury. The district court erred in taking it upon itself to resolve this disputed issue of material fact against Churchill.
 
 
 32
 The trial judge held that even if Churchill's conversations involved matters of public concern, the hospital was justified in discharging her because the hospital's legitimate interest as articulated in Pickering v. Board of Education outweighed Churchill's interest in expressing her opinion. We have summarized the balancing approach of Pickering as follows:
 
 
 33
 "(1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence."
 
 
 34
 Clark v. Holmes, 474 F.2d 928, 931 (7th Cir.1972), cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). The district judge held that in applying these factors
 
 
 35
 "it is clear that the balancing favors the Defendants. Factors (1) and (4) deal with the need to foster healthy working relationships between an employee and her supervisors and co-workers. In this Court's opinion the type of criticism which Churchill voiced to Perkins-Graham about her superiors was inherently disruptive to these interests and justified termination. Thus, even if Churchill's remarks to Perkins-Graham were protected speech on matters of public concern, the Defendants would be entitled to summary judgment under the Pickering balance."
 
 
 36
 (emphasis added). This holding is erroneous because it is based on inferences from the record that are adverse to Churchill. In Jean Welty's deposition she describes the conversation between Churchill and Perkins-Graham as follows:
 
 
 37
 "[Perkins-Graham said], 'Well, she only had one reservation and that was Cindy [Waters].' She had heard some negative things, very negative things about her all over the hospital and a lot of people didn't seem to like her. Cheryl [Churchill] spoke up and said, 'Oh, no, she has her moods but you just learn to pay, not pay attention to them and stay out of her way. And you will be fine when she gets moody. It's a big job,' she said, 'and sometimes it wears her down.'
 
 
 38
 "Q Okay. Did you ever hear Cheryl Churchill make any comments derogatory of Cindy Waters?
 
 
 39
 "A No.
 
 
 40
 "Q At any time during the remainder of that shift did you hear Cheryl Churchill make any comments derogatory of Cindy Waters?
 
 
 41
 "A No."
 
 
 42
 In view of this testimony as well as Churchill's testimony that she told Perkins-Graham that she "didn't have any problem" with Waters and that she and Waters did and could "continue to have a good working relationship, professional working relationship," we believe the district judge erroneously resolved a genuine issue of material fact regarding whether Churchill's speech was critical and disruptive of the hospital's interests in a manner adverse to Churchill.
 
 
 43
 The district judge resolved a second issue of fact adversely to Churchill when he found that her "objective was not to inform but rather to gripe."
 
 
 44
 "[T]he Connick test does not consist in looking at what might incidently be conveyed by the fact that an employee spoke in a certain way. The test requires us to look at the point of the speech in question: Was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?"
 
 
 45
 Zaky v. United States Veterans Admin., 793 F.2d 832, 838 (7th Cir.1986) (citation omitted) (emphasis in original). Churchill argues that the point of her speech was to bring the violation of state nursing regulations to light and to discuss the risks to patients because of the inadequacy of the hospital's cross-training policy, while the hospital asserts that the tenor of the conversation was to express antagonism to the administration. The determination of such an issue is best resolved through giving the judge or jury the opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages of depositions, which is all the court had before it on the summary judgment motion. A witness's behavior during the trial can very well reveal deception or untruthfulness through evasiveness on the witness stand that is more frequently than not undiscernible in the pages of a deposition. It was inappropriate for the district court to make credibility judgments of this nature when deciding the motion for summary judgment.
 
 
 46
 The district court not only made improper credibility determinations in holding that the Pickering tests favored summary judgment for the defendants, it also ignored Churchill's interest in fulfilling her ethical duty as a nurse to speak out on what she believes to be a matter of public concern that is related to the safety and proper care of the patients entrusted to her care.
 
 
 47
 "The nurses's primary commitment is to the health, welfare, and safety of the client. As an advocate for the client, the nurse must be alert to and take the appropriate action regarding any instances of incompetent, unethical, or illegal practice by any member of the health care team or the health care system, or any action on the part of others that places the rights or best interests of the client in jeopardy.... "
 
 
 48
 "When the nurse is aware of inappropriate or questionable practice in the provision of health care, concern should be expressed to the person carrying out the questionable practice and attention called to the possible detrimental effect upon the client's welfare."
 
 
 49
 American Nurse's Association, Code For Nurses with Interpretive Statements §§ 3.1-3.2 (1985) (emphasis added). Construing the record in the light most favorable to Churchill, we believe she was acting in strict accordance with the Code For Nurses. She identified and was trying to do something about the problems that had the potential of having detrimental effects on her patients--charging untrained nurses with patient care in obstetrics, understaffing the hospital and interfering with the duties of competent nurses in obstetrics as the result of assigning cross trainees with a lack of education and skill to them. She also argued that the hospital was possibly in violation of state regulations when transferring nurses into and out of the obstetrics department during the same shift. 77 Illinois Administrative Code, Chapter I § 250.1530, Subchapter b, § f(1)(E). We wish to make it very clear that we do not condone an insubordinate or troublemaking employee, but Cheryl Churchill's actions fall far short of the actions of an insubordinate or problem employee. From our reading of the record, her concern was also that patient health care was endangered due to the controversial cross-training policy that transferred a nurse trained in obstetrics to another department (pediatrics, orthopedics) where that nurse was inadequately trained to give appropriate health care and then recalling her back to the obstetrics department during the same shift. See id.; (TR. Vol. II at 302-309, 317). In taking action to report this controversial practice, Churchill lived up to the highest ethics of her most noble profession. American Nurse's Association, Code For Nurses with Interpretive Statements §§ 3.1-3.2 (1985). Churchill took appropriate action in that she discussed her perception of the problems with Waters, her supervisor, and continued to lobby for change when nothing was done to remedy the situation. She also warned Perkins-Graham of the danger of her, as a cross trainee, supplying inadequate patient care. Churchill's interest in fulfilling her duties and obligations as an ethical, responsible professional, when viewed in this light, clearly outweighs the hospital's interests in interfering and ultimately preventing her from speaking out on important matters of public concern. Thus, we are of the opinion that the district court should have denied the defendant's motion for summary judgment.
 
 
 50
 We note that if the district court had considered the record in the light most favorable to Churchill, it would have concluded that the "history of hostility between Churchill and her supervisors" to which it referred was nothing but a one sided demonstration of hostility toward Churchill. Up until the summer of 1986, when Churchill began opposing the newly instituted training program and she and Dr. Koch began developing their friendship, the relationship between Churchill and her supervisors was positive and congenial. On the December 1985 performance evaluation, Waters found Churchill's sense of humor to be noteworthy, and on three of her four evaluations through December 1985, Churchill's own responses in the section for employee comments included "smiley" faces, thereby revealing her cheerful attitude about her job. The first criticism in Churchill's file came in June of 1986 when Waters described her relationship with Dr. Koch as being unprofessional. It is certainly suspect that Waters' performance evaluations of Churchill plummeted (from positive to negative) almost contemporaneous with the time that Waters gained knowledge of Churchill's personal relationship with Dr. Koch, a physician who in the past had vigorously complained about how the inadequate nurse staffing had contributed to the birth of a brain damaged infant. Waters' disapproval of Churchill's personal relationship with Dr. Koch reveals that Waters considered Koch and Churchill to be "professional allies" jointly opposed to the hospital's cross-training policy. As an example of Waters' attitude towards her during this period of heightened analysis of the cross-training policy, on August 21, 1986, Waters ordered Churchill out of the delivery room to perform a routine check on another patient while Churchill was assisting Dr. Koch in an emergency (code pink) cesarean section procedure. It is well established that the control of the operating room is in the hands of the surgeon in charge. The surgeon is the "Captain of the Ship" in the operating room and in most instances is liable for the negligence of any personnel assisting in the operation. See Berg v. United States, 806 F.2d 978, 983 (10th Cir.1986). Thus, the doctor performing an emergency C-Section has a legitimate expectation of being able to control and direct the nurses and the entire medical staff assisting in the operating room and to be able to count on them to effectively and professionally carry out their respective tasks. Dr. Koch stated that Nursing Supervisor Waters "shouldn't have been in [the operating room]. Her presence was not needed and she should not have been there." He was "very angry because she was disturbing my operating room." As Dr. Koch argued to Waters and Harper in his meeting with them subsequent to the incident, he was the person in command and responsible for the operation as well as the personnel assisting, and it was his duty and responsibility alone to see that the nurses were carrying out their duties; Waters had no business whatsoever in interfering and disrupting the tense, highly-charged atmosphere in the C-Section code pink delivery room scenario where every movement and moment counts vis-a-vis the life of the baby and mother. Under the circumstances, a jury could very reasonably infer that Waters' conduct in ordering Churchill to leave the delivery room was the result of her personal animosity toward Churchill.
 
 
 51
 The record reveals that Waters' criticism of Churchill was primarily because she (Churchill) spoke against the cross-training policy out of her public concern that patient health may be jeopardized. In light of this record, Churchill's purpose and/or motive in making statements to Perkins-Graham about the problems the cross-training policy created in the obstetrics department and her comments about Cynthia Waters' involvement in the cross-training policy certainly present material issues of fact regarding the content of Churchill's speech. As we have established, the district judge obviously made a number of credibility judgments resulting in the resolution of factual issues adverse to Churchill. Since all reasonable inferences must be drawn in favor of the non-moving party on a summary judgment motion, the district court erred.
 
 IV. FIRST AMENDMENT DUE PROCESS
 
 52
 The defendants argue that they have a complete defense to Churchill's claims because, as Churchill alleges, they were unaware of the actual content of her January 16, 1987 conversation with Perkins-Graham. Under Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), a plaintiff is obligated "to show that [her] conduct was constitutionally protected, and that this conduct was a 'substantial factor'--or to put it in other words, that it was a 'motivating factor' " in the termination decision. Thus, the defendants contend, even if the discussion involved protected speech, Churchill has failed to demonstrate that the fact that she was discussing matters of public concern was a motivating cause of her termination. In order to get around this Mt. Healthy defense, the plaintiff argues that the hospital's failure to properly investigate the actual content of her speech violated her right to due process under the First Amendment. Notwithstanding the lack of a Due Process Clause in the First Amendment and the lack of case law holding that an at-will public employee has a right to a hearing before he or she may be discharged for engaging in protected speech, Churchill asserts that we must create such a right in order to protect the free-speech rights of public employees. She insists that otherwise employers may avoid liability for violating employees' free-speech rights through deliberate ignorance of the content of the speech, thereby creating a chilling effect on speech that opposes official policy. We disagree that it is necessary to create a First Amendment due process right in order to protect the rights of public employees to speak out on matters of public concern, for we believe that Mt. Healthy provides adequate safeguards regardless of whether the employer actually knew the precise content of the statements for which it fired the employee.
 
 
 53
 In Mt. Healthy, the Supreme Court considered the claims of a non-tenured teacher whom the school board decided not to rehire (and thus not grant him tenure). The Court ruled that this violated his free-speech rights because the decision was partially based on a conversation the teacher had with a local radio station announcer. The Court held:
 
 
 54
 "Doyle's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms."
 
 
 55
 Id. at 283, 97 S.Ct. at 574 (citations omitted).[9] The Court further held that the plaintiff must establish that he would not have been dismissed absent the constitutionally protected conduct:
 
 
 56
 "The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."
 
 
 57
 Id. at 285-86, 97 S.Ct. at 575. Thus, when an employee claims to have been terminated for engaging in protected speech, the public employer must establish "by a preponderance of the evidence that it would have reached the same decision as to [the employee's termination] even in the absence of the protected conduct." Id. at 287, 97 S.Ct. at 576. The defendants allege they have carried that burden, for they allege that they fired Churchill for complaining in general rather than for engaging in conversation about the cross-training policy. But the point of Mt. Healthy is the "protected conduct," rather than the public employer's knowledge of the precise content of the speech. The hospital admits it discharged Churchill for her conduct in speaking with a fellow employee during a break because they viewed the speech as critical and disruptive. If on remand the jury determines that the point of Churchill's conversation was to raise the issues of inadequate nurse staffing resulting in inept patient care and even danger to patients because of the allegedly ill-conceived and inept cross-training policy rather than simply to complain, then she was engaged in protected conduct. We hold that when a public employer fires an employee for engaging in speech, and that speech is later found to be protected under the First Amendment, the employer is liable for violating the employee's free-speech rights regardless of what the employer knew at the time of termination. If the employer chooses to discharge the employee without sufficient knowledge of her protected speech as a result of an inadequate investigation into the employee's conduct, the employer runs the risk of eventually being required to remedy any wrongdoing whether it was deliberate or accidental.[10]
 
 V. IMMUNITY
 
 58
 The individual defendants argue that they are entitled to qualified immunity from Churchill's claims because there was no clearly established law at the time of her discharge (or now) holding that it would be unconstitutional to fire her for the conduct that was reported to them.
 
 
 59
 "[G]overnment officials performing discretionary functions are shielded from liability for civil damages unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The principle behind the doctrine is that '[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.' Id."
 
 
 60
 Greenberg v. Kmetko, 840 F.2d 467, 472 (7th Cir.1988). The employee must allege that the public employer violated a specific right rather than a generalized or abstract one:
 
 
 61
 "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent."
 
 
 62
 Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).
 
 
 63
 The individual defendants rely upon our statement in Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir.1988), that "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." Id. (quoting Colaizzi v. Walker, 812 F.2d 304, 308 (7th Cir.1987). They assert that at the time of termination, the fact confronting them was that Churchill "had made negative and inappropriate comments about Waters and Davis" that they believed was interfering with working relationships in the hospital. Thus, as in their Mt. Healthy defense, the individual defendants would have us focus on what they knew (or did not know because they failed to conduct a thorough and impartial investigation) about the content of the conversation rather than the fact that they admittedly fired Churchill for her speech. In our opinion, the defendants' argument is misdirected, for the "specific fact[ ] confronting the public official[s]" was that Churchill was accused of engaging in speech that was critical of the administration of the hospital, and in 1987 the law was clear that the speech of public employees while at work was protected under the First Amendment if it was about matters of public concern in connection with their workplace. See Pickering, 391 U.S. at 568, 88 S.Ct. at 1734; see also Egger v. Phillips, 710 F.2d 292, 314 n. 26 (7th Cir.1983). Thus, "a reasonable official [sh]ould [have] underst[ood] that what he [was] doing violate[d]" the employee's free speech rights if he fired her for speaking out on a matter of public concern. Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. We believe it is immaterial that the defendants were allegedly unaware of whether Churchill's speech was in regard to a matter of public concern--for while we decline to impose a due process requirement that public officials investigate the precise content of an employee's alleged complaint, we hold that ignorance of the nature of the employee's speech (in particular in light of the record before us) is inadequate to insulate officials from a § 1983 action.[11]VI. CONCLUSION
 
 
 64
 It is most disheartening to witness this scenario of combat and distrust occurring in far too many hospitals today across our country and is achieving nothing, but to exacerbate the nation's health care problems for hospital administrators are all too often turning a deaf ear to the needs and recommendations of the medical and nursing staffs. It is nothing but a turf battle between the administrators and their respective governing boards versus the health care professionals. This conflict does nothing for, and in fact interferes with and stifles, the health professional's interest and dedication in rendering the optimum of well-accepted patient care within the proper cost guidelines and at the same time without emasculating the employees' rights to express their constitutionally protected views on matters of public concern. This very delicate balance between the administrators, the hospital's board and the health care professionals must be maintained and fostered by all parties for the good of the patients in their care.
 
 
 65
 We hold that the district court erred in granting summary judgment on behalf of the defendants, for there are genuine issues of material fact in dispute regarding the content of Churchill's speech. If the jury finds that Churchill's version of the January 16, 1987 conversation is true, the defendants will be liable for damages for retaliatory discharge unless they can establish that their interest in controlling the workplace under the Pickering test outweighs Churchill's interest in speaking out on matters of patient safety. We further hold that it is immaterial whether the defendants knew (or deliberately ignored) the precise content of Churchill's conversation, for they knew or should have known from the state of the law as of that date that they were terminating her for engaging in speech that may have been protected under the First Amendment; and that the right of public employees to speak out on matters of public concern was established long before 1987. The judgment of the district court dismissing Churchill's free-speech claims is REVERSED AND REMANDED pursuant to Circuit Rule 36 for further proceedings consistent with this opinion.
 
 
 
 [1]
 Although Dr. Koch was able to revive the baby, it still suffered mild mental retardation. The baby's parents brought suit against the hospital and Dr. Koch for the injury in an Illinois state court in 1984. The hospital settled out of court, and a jury acquitted Dr. Koch of any malpractice or other wrongdoing in the occurrence
 
 
 [2]
 A "code pink" in McDonough District Hospital means that the life of a baby or its mother (or both) is in immediate danger. When a code pink is called, all available doctors and nurses are required to report to the room where the emergency is occurring to render assistance
 
 
 [3]
 According to Dr. Koch's deposition, Churchill was the only nurse in the delivery room providing useful aid at the time
 
 
 [4]
 Hopper and Waters unsuccessfully attempted to block Dr. Koch's reappointment to staff privileges at the hospital for 1987
 
 
 [5]
 The hospital's Employee Handbook stated under "DISCIPLINE--GENERAL GUIDELINES" that "[t]he normal progressive discipline procedure consists of: 1. Verbal counseling[;] 2. First written warning[;] 3. Final written warning, which may include suspension[;] and 4. Discharge ... exceptions or deviations from the normal procedure may occur whenever Administration deems appropriate."
 
 
 [6]
 Churchill also asserts that the district court's dismissal of her claim that her termination deprived her of her right to expressive association was in error because the defendants perceived her as being associated with Koch in opposition to the cross-training policy. Her failure to develop the argument (which the district judge rejected) that the defendants' perception of her association with Koch is adequate to establish an association "for the advancement of beliefs and ideas," NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958), constitutes waiver. See United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991) (undeveloped arguments are waived). Furthermore, we agree with the district judge that the right to expressive association "is not implicated when two persons simply hold common beliefs or even when those different person[s] express those common beliefs--they must join together 'for the purpose of' expressing those shared views." Mem.Op. at 14
 
 
 [7]
 The Joint Commission's accreditation rules are an authoritative source of which we may take judicial notice. See Bethel Conservative Mennonite Church v. Commissioner of Internal Revenue, 746 F.2d 388, 392 (7th Cir.1984)
 
 
 [8]
 A statement of another state's regulatory agency, namely the Wisconsin Board of Nursing, dealing with floating or transferring nurses from one discipline to another without proper training further buttresses our discussion and holding that Churchill's conversation in regard to the cross-training policy is a matter of public concern:
 "At times nurses are 'floated' to units needing staffing assistance or they are asked to provide nursing care in settings which are not their primary areas of employment. Competence to perform safely in a particular area of nursing practice is based upon appropriate education, training or experience.
 "[A] nurse may be found negligent and may be disciplined by the board for 'offering or performing services as a licensed practical nurse or registered nurse for which the licensee or registrant is not qualified by education, training or experience.' A nurse is not necessarily qualified or competent to practice in any area of nursing simply because the nurse has graduated from a school of nursing and has passed the licensure exam. Therefore, employers and nurses themselves are accountable for determining competence to practice in a particular area of specialty.... If an employer wants a nurse to rotate to an area that is not the nurse's usual area of assignment, then the employer should provide for the nurse's further education and training to prepare the nurse to work in the area.
 "Education, training or experience preparing the nurse to practice in situations outside the nurse's primary area of employment should be documented and kept on file by the nurse's employer."
 Wisconsin Board of Nursing, Wisconsin Regulatory Digest, Vol. 1, No. 1, 2-3 (March 1988) (emphasis added). The Board has further stated:
 "When nurses are confronted with situations wherein they are asked to provide services for which they do not feel competent, they have a responsibility to decline to do so...."
 "The board prohibits nurses who are not competent in methods of practice from performing nursing care. Protection of the public health and safety is the primary charge of the board, and it sees this charge as essential in the provision of all nursing care."
 Id., Vol. 3, No. 1 at 2 (March 1990).
 
 
 [9]
 We note that while the Court held the claims to be actionable, it did not establish any type of procedural protections and thus did not create a First Amendment due-process right
 
 
 [10]
 We note that the defendants misrepresent the record when they claim that they gave Churchill the same due process that she would have been entitled to receive if she possessed a property right in her employment. Although Davis and Waters met with Churchill prior to termination, and Hopper and Magin met with her later, no one informed her that she was being discharged for her January 16, 1987 conversation with Perkins-Graham. Furthermore, there is no evidence in the record that Churchill's supervisors followed the hospital's general guidelines for discipline (see supra n. 5) and gave her an oral warning prior to her first written warning or counseling thereafter
 
 
 [11]
 The defendants also argue that the hospital is not amenable to suit under § 1983 because it does not have the official policy Churchill alleges, i.e., "that employees could discuss only with supervision matters pertaining to the employees' or the hospital's welfare." The district court did not address this issue, and we are unable to determine the actual hospital policy, for while the personnel policy cited does not explicitly require employees to discuss hospital problems with supervision alone, there is deposition testimony from personnel manager Bernice Magin as well as from the defendant Hopper suggesting that such a policy exists. Regardless of the specific policy, we have serious reservations about whether the defendants can prevail on this defense, for Hopper, the hospital administrator, has the responsibility of "[s]electing, employing, controlling, and discharging employees and developing and maintaining personnel policies and practices for the Hospital." McDonough District Hospital By-Laws, Article IX, § 2, p (D). As Hopper was involved in the decision to fire Churchill (and was the supposed independent reviewer of the decision), the termination may be considered to have been carried out pursuant to hospital policy. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) ("officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.") (plurality opinion). Incidentally, since the individual defendants are not immune and Illinois indemnifies public employees for judgments against them for their actions within the scope of their employment, see Ill.Rev.Stat. ch. 85 p 9-102, it makes little difference in this case whether the hospital itself is subject to suit