United States Court of Appeals,

Eleventh Circuit.

No. 94-2621.

Bruce BECKWITH, Plaintiff-Appellant,

v.

CITY OF DAYTONA BEACH SHORES, FLORIDA, a municipal corporation;
Donald F. Large, individually and in his capacity as Mayor of the
City of Daytona Beach Shores, Florida; Charles McCool,
individually and in his capacity as City Manager of the City of
Daytona Beach Shores, Florida, Defendants-Appellees.

July 25, 1995.

Appeal from the United States District Court for the Middle
District of Florida. (No. 91-953-CIV-ORL-18), G. Kendall Sharp,
Judge.

Before DUBINA and BLACK, Circuit Judges, and COHILL[*], Senior
District Judge.

BLACK, Circuit Judge:

Appellant alleges that Appellees: (1) violated his free
speech rights guaranteed by the First Amendment by disciplining and
terminating him in retaliation for his public and private
opposition to city policy; (2) violated his marriage, liberty, and
free association rights guaranteed by the First and Fourteenth
Amendments by disciplining him for not living with his wife and
family; (3) violated his substantive due process rights guaranteed
by the Fifth and Fourteenth Amendments by disciplining and
terminating him in an arbitrary and capricious manner and for
improper reasons; and (4) violated his procedural due process
rights guaranteed by the Fifth and Fourteenth Amendments by

---

[*]Honorable Maurice B. Cohill, Jr., Senior U.S. District
Judge for the Western District of Pennsylvania, sitting by
designation.

disciplining and terminating him without providing necessary procedural safeguards.[1]  Because the court believes that only Appellant's First Amendment free speech claim has merit, we do not discuss any other claims in this opinion.

On appeal we must decide whether Appellant states a valid claim under the First Amendment and, if so, whether the district court properly entered judgment as a matter of law against Appellant.  We conclude that Appellant has a valid claim, and reverse and remand the district court's entry of judgment as a matter of law.[2]

## I. BACKGROUND

A. *Facts*

This case grows out of Appellant Bruce Beckwith's termination as fire chief of Appellee City of Daytona Beach Shores, Florida (City).  Appellant served as fire chief from 1984 until his termination in 1991.  As a department head, Appellant reported directly to the city manager and could be terminated only for "just cause."  Appellant consistently received above-average performance evaluations from the city manager.  The city manager answers to a city council, which consists of five members including the Mayor, Appellee Donald Large.

---

[1]Appellant's complaint also contained pendent state claims for intentional infliction of emotional distress and defamation. He does not appeal the district court's dismissal of those claims.

[2]Our decision to remand makes it unnecessary to decide whether the district court erred by denying Appellant's request to recall ex-city manager Holmquist.  After carefully considering the other arguments raised on appeal, we conclude that they are without merit and do not discuss them.  *See* 11th Cir. R. 36-1.

The dispute which Appellant claims led to his termination began on August 1, 1990, when Appellant publicly opposed budget-cutting proposals advanced by Mayor Large at a city council meeting. Like most council meetings, the August 1 meeting was poorly attended. Appellant expressed particular concern about a proposal to discontinue the City's paramedic program. He considered the paramedic proposal dangerous to the City's citizens, visitors, and his own employees. After the meeting, Appellant began mobilizing public opinion by discussing the proposed paramedic cut with citizens, most notably the ex-mayor. Appellant urged the people with whom he spoke to attend the next city council meeting in order to oppose or support the proposed cuts.

The next city council meeting on August 8, 1990, was well attended. When the paramedic proposal was raised, Mayor Large retreated from his earlier position, stating that "[t]here's no rescue being eliminated." When a citizen in the audience asked when would the public be able to have an input on the proposal, Mayor Large postponed further discussion until a budget workshop scheduled for the next evening. At the August 9 budget workshop, Mayor Large quickly dropped the proposal to eliminate the paramedic program. In a letter mailed to city residents a few weeks later, Mayor Large[3] trumpeted the council's decision to "*increase* our paramedic staff to meet the most important service needed by our citizens—*EMERGENCY MEDICAL SERVICE*." (emphasis in original).

_____

[3]At trial Mayor Large claimed that, despite his signature, the letter was the city manager Holmquist's idea. Appellant stipulated that Holmquist, if recalled, would directly contradict Mayor Large's testimony.

Appellant also claims that his opposition to the City's public safety officer (PSO) program motivated his termination. The PSO program encourages police officers, firefighters, and paramedics to cross-train and serve in other roles. The city government knew about Appellant's opposition to the PSO program, and Appellant publicly expressed doubts about it on at least one occasion. On August 29, 1990, the city council voted to fund the PSO program despite the city manager's protest that the pilot program was a failure. Another goal of the PSO program was achieved on October 23, 1991—the same day the city council upheld Appellant's termination—when the offices of fire chief and police chief were combined into the office of public safety.

Considerable friction had developed between Appellant and a majority of the city council[4] by the time the council held their final budget meeting on August 29. Early in the meeting, Mayor Large reprimanded Appellant for purportedly sarcastic remarks. Another councilman suggested that "perhaps [the council] better hear from brother Beckwith, because he's talked to everybody else about [the budget]!"[5] Near the end of the meeting, Appellant confronted the council with rumors that "several of you have asked that I be terminated from employment with the city because of insubordination" and expressed his continued opposition to budget cuts being made in his department. Mayor Large responded that:

---

[4]Almost every action by the city council relevant to this case was approved by a four-to-one vote. Generally, the majority was Mayor Large and Councilmen Dannecker, Heller, and Marks; Councilman Schulze was in dissent.

[5]Appellant characterizes this remark as a sarcastic reference to his public opposition to the paramedic proposal.

One of the things that is done in business is respecting the chain of command. And the first thing that you learn outside in the true world is that you report directly to the boss over you. And none of the employees have a policy making decision. They don't feel, or they don't get involved with policy.... So for an employee to go out, and go past the city manager, over the councilm[e]n's heads, to a citizen, to try to influence that person, is to me total[ly] insubordinate. If that were to happen to me, on my job, I would be fired.

After the paramedic budget dispute, Mayor Large commenced an investigation of Appellant. The "Beckwith Investigation" focused on whether Appellant's actions after the August 1 council meeting were improper. City Manager Holmquist presented the investigation's results to the city council on September 10, 1990, and concluded that "nothing ... supports any form of insubordination by the fire chief." The council voted to accept the report, but Mayor Large and another councilman appeared reluctant to accept Holmquist's conclusion.

Presenting the Beckwith Investigation to the city council was one of Holmquist's last acts as city manager. He tendered his resignation to the council at the same meeting. His resignation letter, dated September 4, 1990, states:

Individual Councilmen have requested that I take actions against two Department Heads. After gaining legal advice and studying internal investigations, I believe such actions are unwarranted, politically motivated, and would pose potential liability to the city.

At trial, Holmquist testified that Appellant was one of the department heads referred to in the letter.[6] He admitted having had some problems with Appellant. He denied, however, that he wanted to fire Appellant and stated that he considered Appellant to

---

[6]Holmquist testified that the other department head was chief building official Dwayne Manuel. The city council eliminated Manuel's job on August 29, 1990.

be a competent and strong leader.  According to Holmquist, Mayor Large demanded Appellant's termination because of Appellant's opposition to the paramedic proposal and PSO program.[7]  Holmquist testified that retaining his job was contingent on his firing Appellant, and that he resigned rather than carry out the termination.  Mayor Large's testimony directly contradicts Holmquist's.  According to Mayor Large, Holmquist wanted to fire Appellant in August 1990, and Mayor Large merely suggested that Holmquist could fire Appellant if he wished.  Mayor Large denied making Holmquist's job contingent on firing Appellant.

The city council eventually hired Appellee Charles McCool to replace Holmquist as city manager.  The council must select the city manager in public.  Nevertheless, several councilmen expressed a desire "to avoid the sunshine" during the selection process.  The council seemed to prefer interviewing the final city manager candidates individually, in private.  McCool admitted meeting informally with several councilmen prior to his selection, but denied discussing Appellant or the PSO program at these meetings.  Prior to his selection, McCool also attended a city council meeting about the PSO program.  After the meeting, he met briefly with Mayor Large and the council and, according to McCool, superficially discussed the PSO program.  At trial, McCool categorically denied being asked to terminate Appellant.

McCool began as city manager in early December 1990.  His

_____

[7]Holmquist's testimony does not indicate that Mayor Large clearly explained his reason for wanting to terminate Appellant, but Holmquist appears to have understood that the paramedic proposal and PSO program were the reason.

first trouble with Appellant occurred about one month later. According to McCool, in December 1990, Appellant moved to his new wife's residence outside the area specified in Appellant's job description. On January 11, 1991, McCool placed Appellant on sixty-day probation for allegedly violating the residency requirement. McCool testified that, when confronted, Appellant admitted living outside the residency area. But Appellant testified that he was not living outside the residency area, and that he so informed McCool. Appellant maintained that he continued living within the residency area in order to care for his elderly mother.

In March 1991, McCool extended Appellant's probation and suspended him without pay for thirty days for a "willful and voluntary violation of your job description." McCool explained that Appellant's arrangement to stay at his mother's residence and his wife's attempts to sell her residence and relocate did not satisfy the residency requirement and warranted disciplinary action. According to Appellant, McCool told him that the residency requirement would not be satisfied until his family sold their home and moved into the area. Appellant made no effort to appeal these disciplinary decisions.

The final events leading to Appellant's termination began on May 13, 1991, when McCool sent Appellant a memo asking whether the City could use firefighter Charles Frost as a paramedic. The memo suggested that because of Frost's emergency medical technician training, "his skills should be utilized by the City, at the very least on a "fill-in' or "replacement' basis and, as appropriate, be

utilized on a full time basis."

McCool met with Appellant on May 24, 1991, to discuss Frost's opportunities. According to McCool, after listening to Appellant for over an hour,[8] he interrupted Appellant and directly asked whether city policy might prevent using Frost as an additional paramedic. McCool testified that Appellant told him in response that no policy existed. He admitted that Appellant "probably" told him that city policy allowed six paramedics, but insisted that Appellant said nothing indicating that the number was limited to six. McCool claimed that he learned about a policy limiting the number of paramedics to six in July 1991 and lost confidence in Appellant due to his failure to inform McCool of that policy. Appellant disputes McCool's version of the May 1991 meeting. He testified that McCool never asked him whether a city policy regarding the number of paramedics existed and, therefore, denied that he misinformed McCool.

The parties dispute the existence of a policy limiting the City to six full-time paramedics. The city council discussed a six-paramedic staffing level in January 1987, and McCool testified that he relied on that policy when terminating Appellant. Transcripts of that council meeting, however, do not indicate that six was an absolute limit, and the discussion of paramedic staffing never culminated in a vote.[9] Moreover, although the budget

---

[8]McCool's trial testimony contradicts a memo by McCool dated August 6, 1991, stating that the meeting lasted about twenty minutes.

[9]The parties also dispute whether the absence of a formal vote is significant.

developed in August 1990 funded six full-time paramedics, it is not at all clear whether that decision represented official policy or whether that decision set any limit. In fact, McCool testified that the 1990-91 budget simply fulfilled the policy that he claims was established in 1987.

Appellant maintains that recommending Frost as a seventh paramedic violated no policy because the City routinely used part-time paramedics, and the City government, at least as of August 1, 1990, was aware of that practice. Nevertheless, at Appellant's termination hearing, Mayor Large insisted that the six-paramedic policy was an absolute limit. At trial, however, McCool conceded that no policy limited the number of part-time paramedics. In fact, McCool approved Frost's use as a part-time paramedic on the day Appellant's termination became final, and the day after Appellant's termination, the City was paying Frost as a seventh, part-time paramedic.

McCool informed Appellant that he was contemplating termination in a memo dated August 26, 1991. McCool testified that he fired Appellant for failure to inform him about city policy. The termination became effective on September 30, 1991. Following termination, Appellant exercised his right to appeal to the city council. They upheld the termination on October 23, 1991.

B. *Procedural History*

Appellant brought this 42 U.S.C. § 1983 suit in the Middle District of Florida, advancing six federal and state bases for

liability.[10]  Following discovery, Appellees moved for summary judgment on all claims.  They argued that, even assuming Appellant's speech was protected by the First Amendment, Appellant had failed to produce evidence that this activity substantially motivated the decision to terminate him.  Mayor Large and McCool also claimed that they were entitled to qualified immunity.  The district court denied Appellees' motions for summary judgment on the federal claims, and this Court affirmed the district court's denial of qualified immunity.  *Large v. Beckwith,* 11 F.3d 167 (11th Cir.1993).

The case went to trial before a jury in April 1994.  Opening statements and the presentation of Appellant's case took seven days.  The jury heard testimony from Beckwith, his wife, a city firefighter, ex-city manager Holmquist, Mayor Large, and McCool.  The jury also heard tapes of the city council meetings discussing the paramedic budget, the PSO program, Holmquist's resignation and replacement, and Appellant's termination.  Other evidence before the jury included records of the Beckwith Investigation, Holmquist's letter of resignation, McCool's memo requesting information about Frost, and correspondence between Appellant and McCool related to disciplinary actions and Appellant's ultimate termination.

At the close of Appellant's case, the district court granted Appellees' motion for judgment as a matter of law.  In a subsequently filed order, the district court found that the

---

[10]Appellant amended his complaint twice.  We take the allegations from the second amended complaint.

evidence failed to show that First Amendment protected activity was a substantial factor in the decision to terminate Appellant. Noting that Appellant's opposition to the proposed paramedic cuts occurred at least one year before his termination, and the fact that McCool was not employed by the City when the paramedic dispute arose, the district court found that "problems that arose with Beckwith while McCool was city manager are separate and distinct from the discussions concerning elimination of the paramedic program ... and the implementation of the [PSO] Program." The court found that Appellant "misinformed McCool about the maximum number of full-time paramedics allowed." Thus, the district court concluded that "McCool terminated Beckwith because McCool lost complete confidence in Beckwith [and] the decision to terminate Beckwith had nothing to do with Beckwith's opposition to the elimination of the paramedic program or the implementation of the [PSO] Program." This appeal follows.

## II. STANDARD OF REVIEW

Marking the line between speech protected by the First Amendment and speech which the state may legitimately regulate presents a question of law. *See New York Times v. Sullivan,* 376 U.S. 254, 283-87, 84 S.Ct. 710, 728-29, 11 L.Ed.2d 686 (1964). Courts "must "make an independent examination of the whole record'" to ensure that no "forbidden intrusion on the field of free expression" has occurred. *Id.* at 285, 84 S.Ct. at 729 (quoting *Edwards v. South Carolina,* 372 U.S. 229, 234-36, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)). Thus, where an employee claims that government employment decisions were made in retaliation for the

exercise of First Amendment rights, we conduct a *de novo* review on the question of whether the First Amendment protects the employee's conduct. *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 150 n. 10, 103 S.Ct. 1684, 1690 n. 7, 1692 n. 10, 75 L.Ed.2d 708 (1983); *Goffer v. Marbury,* 956 F.2d 1045, 1049 (11th Cir.1992).

Although we review First Amendment questions *de novo,* issues of causation in a retaliatory discharge claim present questions of fact. In cases tried before a jury, the jury should decide questions of motive and intent behind a government employment decision. *Bryson v. City of Waycross,* 888 F.2d 1562, 1566 n. 2 (11th Cir.1989); *Sykes v. McDowell,* 786 F.2d 1098, 1104-05 (11th Cir.1986). *See also Pullman-Standard v. Swint,* 456 U.S. 273, 288-91, 102 S.Ct. 1781, 1790-91, 72 L.Ed.2d 66 (1982) (holding that the issue of discriminatory intent in a race discrimination case is a factual question for the trier of fact).

Where a district court resolves factual issues by entering judgment as a matter of law, we review that decision *de novo,* applying the same standards which bound the district court. *Daniel v. City of Tampa,* 38 F.3d 546, 549 (11th Cir.1994), *cert. denied,* 1995 US LEXIS 3956, --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ---- (1995). A district court may enter judgment as a matter of law if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). *See Vulcan Painters, Inc. v. MCI Constructors, Inc.,* 41 F.3d 1457, 1461 (11th Cir.1995). When considering a motion for judgment as a matter of law, the court must evaluate all the evidence, together with any logical

inferences, in the light most favorable to the non-moving party. *Walker v. Nationsbank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995).

## III. DISCUSSION

The threshold legal question of whether the First Amendment protects an employee's speech is central to, and often dispositive of, most retaliatory discharge cases. *See, e.g., Connick,* 461 U.S. at 154-56, 103 S.Ct. at 1694 (holding that employee's termination did not violate the First Amendment); *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993) (same), *cert. denied,* --- U.S. ----, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994); *Bryson,* 888 F.2d at 1567 (same); *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989) (same). This case is unusual because the threshold question of First Amendment protection is not disputed. Instead, Appellees argue: (1) that Appellant lacks a First Amendment claim after this Court's decision in *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (en banc), *cert. denied,* --- U.S. ----, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995); and (2) that no reasonable jury could find that First Amendment speech was a substantial factor in Appellees' decision to terminate Appellant.

A. *First Amendment Retaliatory Discharge Claims after McKinney v. Pate*

Appellees argue that *McKinney v. Pate,* 20 F.3d 1550, a decision that "altered the legal landscape" of this Circuit, *Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994), precludes Appellant's First Amendment retaliatory discharge claim.[11]

---

[11]This contention was not clearly raised until oral argument. Generally, issues not clearly raised in the briefs are

We disagree.[12]

McKinney involved a county building official's § 1983 suit against his immediate superior and members of the board of county commissioners. *McKinney,* 20 F.3d at 1554. The plaintiff, McKinney, was allegedly terminated for a variety of legitimate reasons, generally depicting McKinney as a deficient worker. *Id.* McKinney's federal claim "alleged that the various charges against [him] were pretextual and that [the defendants] therefore fired McKinney without reason." *Id.* at 1555. According to McKinney, this "violated his "constitutional employment rights' and consequently denied him substantive due process." *Id.*

The question presented to the en banc *McKinney* court was "whether, under the Fourteenth Amendment, a government employee possessing a state-created property interest in his employment states a substantive due process claim, rather than a procedural

considered abandoned. *See Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1542 (11th Cir.1994). Nevertheless, we reach the issue because Appellees' *McKinney* argument raises an important question of law and the interest of substantial justice is at stake. *See Narey v. Dean,* 32 F.3d 1521, 1526-27 (11th Cir.1994).

[12]*Tindal,* while recognizing the importance of *McKinney,* suggests that First Amendment retaliatory discharge claims survived *McKinney.* In *Tindal* a sheriff's office employee claimed that the defendants: (1) violated her substantive due process rights guaranteed by the Fourteenth Amendment by terminating her in an arbitrary and capricious manner; and (2) violated her free speech rights guaranteed by the First Amendment by terminating her in retaliation for participation in a suit charging the former sheriff with sex and race discrimination. *Tindal,* 32 F.3d at 1537. This Court held that *McKinney* foreclosed the plaintiff's substantive due process claim, but partially affirmed the denial of qualified immunity on the plaintiff's First Amendment claim. *Id.* *Tindal* did not address whether *McKinney* barred First Amendment claims, and nothing indicates that the issue was raised. The result in *Tindal,* however, suggests that *McKinney* did not affect First Amendment retaliatory discharge claims.

due process claim, when he alleges that he was deprived of that employment interest by an arbitrary and capricious non-legislative government action." *Id.* at 1553. Analyzing the relevant Supreme Court precedent, the Court concluded that "[b]ecause employment rights are state-created rights and are not "fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." *Id.* at 1560. The Court held "that, in non-legislative cases, only procedural due process claims are available to pretextually terminated employees. Thus, we conclude that our prior decisions, which granted pretextually terminated employees section 1983 causes of action premised on substantive due process violations, are contrary to Supreme Court jurisprudence...." *Id.* The Court was quick to add, however, that "there continue to be rights that a state may not remove, regardless of the process, as well as actions that can not be countenanced, regardless of the appropriateness of the process." *Id.* at 1560 n. 15.

Appellees' argument that this case is factually indistinguishable from *McKinney* ignores a crucial distinction between that case and the one before us: McKinney did not, and probably could not, allege that his termination was in retaliation for First Amendment protected activities. *See id.* at 1555. Thus, the *McKinney* opinion says nothing about First Amendment retaliatory discharge claims. Although "it is not unusual for a court to change the law without emphasizing its departures from or reinterpretation of precedent," *United States v. Hollingsworth,* 27 F.3d 1196, 1198 (7th Cir.1994) (en banc), it is difficult to

believe that *McKinney* narrowed state employees' rights to be free from retaliatory discharge without discussing the First Amendment or the Supreme Court's retaliatory discharge cases.[13]

More fundamentally, Appellees misunderstand the reasoning behind *McKinney*. *McKinney* recognized that almost all § 1983 claims rely on the substantive component of the Due Process Clause because it is through that vehicle that fundamental rights are incorporated against the states. *McKinney,* 20 F.3d at 1556. These fundamental rights include most of the rights protected by the Bill of Rights, and certain well-recognized, unenumerated rights. *Id. McKinney* did not disturb a litigant's ability to vindicate fundamental rights though the substantive component of the Due Process Clause. *Id.* at 1556 n. 8. *McKinney* 's limitation on a state employee's federally protected rights only affected areas "largely outside the scope of substantive due process jurisprudence [like] tort law and public employment law." *Id.* at 1556 (citations omitted). "In short, areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution.' " *Id.* (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Powell, J., concurring)). Hence, because McKinney's suit was

_____

[13]The only Supreme Court precedent cited in *McKinney* which discusses a First Amendment retaliatory discharge claim is *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The context of the *Perry* citation indicates that the reference is to the procedural due process, not First Amendment, portion of that opinion. *McKinney,* 20 F.3d at 1561 (citing *Perry,* 408 U.S. at 597-98, 92 S.Ct. at 2698).

based upon his purported "constitutional employment rights," *id.* at 1555, which "are state-created rights and are not "fundamental' rights created by the Constitution," they did not enjoy substantive due process protection, *id.* at 1560. *See also Bussinger v. City of New Smyrna Beach,* 50 F.3d 922, 925 (11th Cir.1995) (holding that *McKinney* barred claim that plaintiff's termination deprived him of a protected interest in his job).

Unlike McKinney, Appellant seeks to vindicate a right arising from the First Amendment of the Constitution, [14] not one which is created by the state. A state employee does not need a protectable property interest, or any other state-created right, in order to maintain a First Amendment retaliatory discharge claim. In *Rankin v. McPherson,* the Supreme Court explained that "[e]ven though [the plaintiff] was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression." 483 U.S. 378, 383-84, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). In *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* the Court held that "[e]ven though [plaintiff] could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of

---

[14]The First Amendment, incorporated against the states through the Fourteenth Amendment, *New York Times,* 376 U.S. at 276-78, 84 S.Ct. at 724, requires that the government "make no law ... abridging the freedom of speech," U.S. Const. amend. I.

constitutionally protected First Amendment freedoms." 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (citations omitted). In *Perry v. Sindermann,* the Court held that the plaintiff's lack of "a contractual or tenure right to re-employment" did not defeat his First Amendment claim. 408 U.S. at 597, 92 S.Ct. at 2697.

> [E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis *that infringes his constitutionally protected interests—especially, his interest in freedom of speech.*

*Id.* (emphasis added). Thus, although a retaliatory discharge claim by a state employee involves the denial of the state-created benefit of employment, the right upon which a retaliatory government employment decision infringes is the right to free speech, not the right to a job. *McKinney* has no impact on such claims.

Finally, First Amendment retaliatory discharge claims do not raise the same policy concerns which animated *McKinney.* Discussing the protection of unenumerated rights, *McKinney* explains that "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *McKinney,* 20 F.2d at 1556 (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)). In contrast, the First Amendment's text and two centuries of free speech tradition and jurisprudence provide ample guideposts for courts examining retaliatory discharge claims. The existence

of manageable First Amendment standards also explains why retaliatory discharge claims do not raise the same "Monday morning quarterbacking" problems associated with open-ended substantive due process suits. *See McKinney,* 20 F.3d at 1564. Unlike a vague standard examining whether the termination was "for an improper motive ... pretextual, arbitrary and capricious, and ... without any rational basis," *Adams v. Sewell,* 946 F.2d 757, 766 (11th Cir.1991) (quoting *Hearn v. City of Gainesville,* 688 F.2d 1328, 1332 (11th Cir.1982)), the First Amendment retaliatory discharge standard minimizes the danger that state employees will use § 1983 suits as a "sword" to force their employers to retain unsuitable employees. *See McKinney,* 20 F.3d at 1564.

We hold that state employees retain a federal cause of action under the First Amendment[15] when they allege that government employment decisions were taken in an attempt to chill expression protected by the First Amendment. Appellant's suit states a valid claim for relief.

B. *The Retaliatory Discharge Claim*

Appellant argues that the district court erred by resolving factual disputes in favor of Appellees and ignoring evidence creating a sufficient basis for a reasonable jury to find for Appellant. Appellees respond that the district court correctly found that the evidence, when viewed in the light most favorable to Appellant, is legally insufficient for a reasonable jury to rule in favor of Appellant.

The First Amendment protects government employees from some,

---

[15]As incorporated by the Fourteenth Amendment.

but not all, restraints on their right of free expression. *See, e.g., United States v. National Treasury Employees Union,* --- U.S. ----, ----, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995); *Pickering v. Board of Ed.,* 391 U.S. 563, 566-68, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). This Circuit examines First Amendment retaliatory discharge claims under the four part test announced in *Bryson v. City of Waycross,* 888 F.2d 1562 (11th Cir.1989). *Tindal,* 32 F.3d at 1539; *Morgan,* 6 F.3d at 754. The *Bryson* test examines (1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct. *Bryson,* 888 F.2d at 1565-66.

The first two elements of the *Bryson* test are questions of law designed to determine whether the employee's speech is protected by the First Amendment. Appellees do not argue that Appellant's opposition to the paramedic cuts and PSO program are not protected by the First Amendment,[16] and the record supports a conclusion that this activity is protected. Appellant's speech concerns political matters at the core of activity protected by the First Amendment. *See generally, McIntyre v. Ohio Election Comm'n,* --- U.S. ----, ---- - ----, 115 S.Ct. 1511, 1518-19, 131 L.Ed.2d

---

[16]Appellees' failure to brief this issue abandons it for the purposes of this appeal. *See Allstate,* 27 F.3d at 1542.

426 (1995) (explaining that speech on public issues "occupies the core of the protection afforded by the First Amendment").  Few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services.  It is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens.  *See, e.g., Connick,* 461 U.S. at 150-54, 103 S.Ct. at 1692-93 (cautioning that "a stronger showing [of government interests] may be necessary if the employee's speech more substantially involved matters of public concern");  *Pickering,* 391 U.S. at 570-72, 88 S.Ct. at 1736 (holding that the public's interest in school funding and teachers' special knowledge of school spending make it "essential that [teachers] be able to speak out freely on such questions without fear of retaliatory dismissal").

The third and fourth elements of the *Bryson* test are questions of fact designed to determine whether a retaliatory motive was the legal cause of the challenged employment decision. To get before the jury, Appellant had to present enough evidence for a reasonable jury to conclude that his protected speech was a "substantial" motivating factor in the decision to terminate him. Appellees could still avoid liability, however, by convincing the jury that Appellant would have been terminated in the absence of First Amendment protected activity.  *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576;  *Tindal,* 32 F.3d at 1540;  *Bryson,* 888 F.2d at 1565.  Nevertheless, if Appellant produced enough evidence for a reasonable jury to conclude that a retaliatory animus

substantially motivated his termination, Appellees could only rebut this showing by convincing the jury, not the court, that a legitimate reason justified the decision. *See Pullman-Standard,* 456 U.S. at 288-91, 102 S.Ct. at 1790-91 (holding that issues of discriminatory intent and actual motivation are questions of fact for the trier of fact); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983) ("Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by *proving* by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor."), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

It is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a "substantial" or "motivating factor" behind a government employment decision. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Nevertheless, *Waters v. Churchill,* --- U.S. ----, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), suggests that an employee's burden is not a heavy one. In *Waters,* Churchill brought a § 1983 claim against a state hospital alleging that her termination was in retaliation for protected speech. *Id.* at ---- - ----, 114 S.Ct. at 1882-83. Briefly addressing the intent issue,[17] the Court concluded that a material issue of fact was created by evidence of Churchill's

_____

[17]Most of the *Waters* opinion concerns "whether the *Connick* test should be applied to what the government employer thought was said, or to what the trier of fact ultimately determines to have been said." *Id.* at ----, 114 S.Ct. at 1882.

criticism of hospital policy, evidence of management "sensitivity" about the criticisms, and evidence of conduct that, viewed in the light most favorable to the plaintiff, showed management hostility because of the criticisms. *Id.* at ----, 114 S.Ct. at 1891 (citing *Churchill v. Waters,* 977 F.2d 1114, 1125-26 (7th Cir.1992)). The Court relied on a sudden drop in Churchill's performance evaluations, criticism of her relationship with a doctor, and a supervisor's unusual ordering of Churchill out of an operating room as significant evidence of management hostility. *Id.* at ----, 114 S.Ct. at 1891 (citing *Churchill,* 977 F.2d at 1125-26). Thus, purely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue of the government's motive.

A *de novo* review of the record reveals that the district court improperly resolved factual disputes in favor of Appellees. First, the court found that Appellant "misinformed McCool about the number of full-time paramedics allowed." Testimony before the jury leaves doubt as to whether any misinformation occurred. According to Appellant, McCool never directly asked about policy limits, and even McCool admitted that Appellant "probably" told him something about a six-paramedic policy. Second, the district court assumed the existence of a six-paramedic limit. The evidence does not justify that assumption. There was no written policy limit. Instead, the vague discussions from January 1987, which never led to a vote on the issue of paramedic staffing, were the best evidence of any limit. Third, the district court found that Appellant was validly on probation for violating the residency

requirement. Appellant disputed this conclusion, testifying instead that he had continued living within the residency area.[18] Finally, the district court found that Mayor Large merely suggested that Holmquist could fire Appellant after they discussed tension between Holmquist and Appellant. This finding cannot be reconciled with Holmquist's testimony that Mayor Large asked for Appellant's termination and made the city manager's job contingent on taking that action. Because the district court improperly resolved these disputed issues of fact, we must ignore these factual conclusions in reviewing the decision to enter judgment as a matter of law.

Review of the record uncovers sufficient evidence for a reasonable jury to conclude that Appellant's speech was a substantial factor leading to his termination. Ex-city manager Holmquist's testimony is direct evidence of discriminatory motive on the part of Mayor Large. Holmquist's testimony is corroborated by his letter of resignation stating that the city council asked him to take "unwarranted [and] politically motivated" action against two department heads. Such direct evidence of discriminatory motive, standing alone, is usually sufficient to create a jury question on the issue of intent. *See, e.g., Swint v. City of Wadley,* 51 F.3d 988, 1000 (11th Cir.1995) (holding that a single witness's testimony about an officer's racist statement created a genuine issue of material fact on the issue of intent to discriminate).

---

[18]We affirm the district court's entry of judgment as a matter of law on Appellant's marriage, liberty, and association rights claim. Nevertheless, a reasonable jury can still conclude that McCool used the residency requirement as a pretext in order to punish Appellant for the exercise of free speech rights.

Appellant also produced copious circumstantial evidence which, when viewed in the light most favorable to Appellant, supports a reasonable conclusion that his termination was retaliatory. The fact that Mayor Large initiated the Beckwith Investigation certainly suggests a desire to punish Appellant for protected speech. Although the city council took no official action following the investigation, a reasonable jury could infer that the investigation convinced the council that they had to take any retaliatory action unofficially in order to avoid liability or public reaction. Tapes of the August and September city council meetings also support an inference that Mayor Large and the council harbored retaliatory animus towards Appellant. After hearing Mayor Large call Appellant's actions "insubordinate," a councilman make a sarcastic reference to Appellant's public discussions, and the council's reluctance to accept the Beckwith Investigation's conclusion, a reasonable jury could conclude that the city council was eager to take action against Appellant.

The district court erred by supporting its decision with the undisputed fact that McCool was not the city manager when Appellant's speech occurred. The evidence, viewed in a light most favorable to Appellant, shows that Holmquist resigned rather than terminate Appellant, depicts a city council uncomfortable with the public process for selecting a new city manager, and reveals that McCool had private, off-the-record meetings with the council before he was hired. A reasonable jury could infer from this evidence that McCool was a "hired gun" chosen, at least partially, because he was willing to carry out the council's retaliatory plan. The

circumstantial nature of this evidence is not fatal; by discounting evidence of McCool's possible motive, the district court ignored the settled rule that the inherent difficulty of proving discriminatory intent often requires reliance on circumstantial evidence. *See Allen v. County of Montgomery,* 788 F.2d 1485, 1488 (11th Cir.1986). Thus, considered in a light most favorable to Appellant, evidence that McCool was hired after the paramedic budget dispute supports an inference of retaliatory termination.

We reject Appellees' suggestion, echoed by the district court, that it takes an "improbable leap over one year in time" to conclude that Appellant's speech substantially motivated his termination. As an initial matter, this argument fails to view facts and make logical inferences in favor of Appellant when considering the timing of Appellant's termination. The most significant protected speech occurred in August 1990. Holmquist's refusal to fire Appellant forced his resignation in September. Holmquist's resignation and the Beckwith Investigation put the council on notice that Appellant's speech was protected and that firing him would expose the City to liability. Consequently, the council had to find a city manager willing to illegally fire Appellant in a way that would avoid liability. The council's search ended in December 1990, when they hired McCool. In January 1991, McCool put Appellant on temporary probation. That probationary status became permanent in March. In May 1991, McCool solicited Appellant's advice on Frost. After the two previous disciplinary actions, the Frost meeting gave McCool the pretext he

needed accomplish the council's wishes. By August 1991, McCool had taken action to terminate Appellant, but the requirements of due process delayed the completion of that procedure until October 1991. Viewed in this light, the sequence of events culminating in Appellant's termination suggests a very deliberate strategy on the part of Appellees. A reasonable jury could infer that Appellees, on notice that their goal was illegal, used a relatively slow and deliberate process to terminate Appellant.

Second, although Appellees disclaim any desire to create a *per se* rule (Oral Arg.), their timing argument would replace a fact-bound, common-sense inquiry with an artificial rule of law. The critical question in this case is whether a retaliatory motive was a substantial factor in Appellees' decision to terminate Appellant. Resolving this question requires the careful consideration of *all* the evidence and *any* logical inferences drawn from that evidence. Undue focus on timing distorts this well-established sufficiency of the evidence formula and would not help resolve intent questions like the one before us. *Cf. United States v. Brown,* 43 F.3d 618, 625 (11th Cir.1995) (rejecting a fixed list of entrapment factors in favor of a fact-bound, common-sense inquiry).

Third, a holding that the circumstances of this case make a one-year gap sufficient to defeat retaliatory discharge claims as a matter of law would give state actors a fail-safe recipe for avoiding the command of the First Amendment. We believe that the settled summary judgment and judgment as a matter of law standards provide state employers with sufficient protection from frivolous

retaliatory discharge claims without resort to a judicially-fashioned, quasi-*per se* rule based upon the amount of time between speech and termination.[19]

Fourth and finally, a holding that the time gap in this case insulates the government from the retaliatory discharge claim would be inconsistent with this court's decision in *Tindal,* 32 F.3d 1535. In *Tindal,* a terminated employee alleged that she was fired in retaliation for giving affidavits and testimony protected by the First Amendment. *Id.* at 1537. The plaintiff submitted an affidavit supporting discrimination claims against her superior in August 1988, and testified in the same case in February 1989. *Id.* Yet the discipline leading to her termination only began in July 1989, and her termination was not final until October 1989. *Id.* at 1538. Thus, in *Tindal* there was an eleven-month gap between the plaintiff's initial protected activity and the initial discipline, and a fourteen-month gap between the initial activity and the final termination. Nevertheless, the court held that "a trier of fact could conclude that the Sheriff had no other cause for firing [the plaintiff]." *Id.* at 1539. In the instant case only five months separate the paramedic budget dispute and McCool's initial discipline of Appellant. Twelve months separate the paramedic dispute and the start of termination proceedings, and fourteen months separate the paramedic dispute and Appellant's final termination. As in *Tindal,* these gaps of time, standing alone, do not preclude Appellant from producing enough evidence for a

---

[19]The courts' duty to independently decide whether the employee's speech is protected by the First Amendment provides an additional safeguard against abuse.

reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate him.

We hold that the district court erred by granting Appellees' motion for judgment as a matter of law. The district court improperly resolved factual disputes in favor of Appellees, failed to view evidence in the light most favorable to Appellant, and ignored inferences that a reasonable jury could make in concluding that Appellant's protected speech was a substantial factor in Appellees' decision to terminate him.

## IV. CONCLUSION

This case demonstrates the confusion caused by "shotgun pleading." Appellant's complaint alleged six causes of action, and he brought four of them before this Court. The resulting difficulty in sorting through allegations almost drowns a meritorious claim in a sea of marginal ones.[20] The bar would be better served by heeding this advice: "In law it is a good policy never to plead what you need not, lest you oblige yourself to prove what you cannot." Abraham Lincoln, Letter to Usher F. Linder, February 20, 1848 *in The Quotable Lawyer* 241 (D. Shrager & E. Frost, eds., 1986).

Appellant states a valid claim under the First Amendment. The district court erred by entering judgment as a matter of law in favor of Appellees because the record contains sufficient evidence for a reasonable jury to rule in favor of Appellant.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[20]For example, Appellant's argument that legislative acts of the council violated his substantive due process rights borders on frivolous. *See McKinney,* 20 F.3d at 1557 n. 9.