[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13952

_____

D.C. Docket No. 1:16-cv-03678-WSD

DAWN M. JONES,

Plaintiff - Appellant,

versus

GOLDEN RULE INSURANCE
COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 23, 2018)

Before MARTIN, JULIE CARNES, and GILMAN,* Circuit Judges.

GILMAN, Circuit Judge:

---

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Dawn M. Jones obtained a short-term health-insurance policy (the Policy) from Golden Rule Insurance Company (Golden Rule) in June 2014.  Shortly after the Policy's effective date, Jones was diagnosed with breast cancer.  Golden Rule denied coverage for her breast-cancer treatment under the Policy's preexisting-condition provision because Jones had received a routine screening mammogram prior to the effective date that, although inconclusive, ultimately led to her breast-cancer diagnosis.

The district court granted summary judgment for Golden Rule based on two different prongs of the Policy's definition of the term "preexisting condition."  We conclude that one of those prongs is inapplicable in this case by its plain terms as applied to the uncontested facts.  The other prong we find ambiguous and, because a plausible reading of that prong would result in coverage for Jones's treatment, we **REVERSE** and **REMAND** with instructions for the district court to grant summary judgment in favor of Jones on her breach-of-contract claim and for any further proceedings not inconsistent with this opinion.

## I.    BACKGROUND

### A.    Factual background

### 1.    *Jones was diagnosed with breast cancer shortly after obtaining a short-term health-insurance policy from Golden Rule.*

2

The facts of this case are not in dispute.  Jones, a former attorney at King & Spalding LLP, gave her employer 30 days' notice on April 1, 2014, that she intended to leave the firm to start her own law practice.  Rather than temporarily assuming the full cost of her employer-subsidized health insurance, as is permitted by the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. § 1161(a), Jones elected instead to purchase a cheaper short-term health-insurance policy from Golden Rule to provide coverage during her job transition.  Jones submitted an application for the Policy on June 25, 2014, and it took effect the following day.

Jones received routine screening mammograms around the same time each year as part of her annual physical checkup.  As it so happened, Jones underwent her 2014 screening mammogram on April 16 while still covered by her King & Spalding insurance.  Jones was not aware of any pain, lumps, or other symptoms of breast cancer at the time of her annual mammogram.

Although Jones typically received her mammogram results within a month of the procedure, she was unable, for reasons that are not explained in the record, to promptly obtain the results from the April 2014 mammogram.  Knowing that her King & Spalding insurance would lapse at the end of April, Jones began calling the provider that performed her mammogram, Emory Adventist Hospital (Emory), the week after her procedure to confirm that she did not require a follow-up

3

mammogram.  Emory informed Jones that her mammogram results were not yet available.  Despite several subsequent calls, Jones was unable to obtain the results of her procedure, so she visited Emory in person on July 14, 2014, and finally read the report that had been written in May by her radiologist, Amanda Bauer, M.D.

The report made the following observations:

FINDINGS:  The breast tissue is heterogeneously dense (BI-RADS Type III Density).  The breast has more areas of fibrous and glandular tissue (from 51 to 75%) that are found throughout the breast.  This can make it hard to see small masses (cysts or tumors).  Linearly distributed calcifications are noted in the right axillary tail posteriorly.  No dominant masses, calcifications, or indirect signs of malignancy are identified in the left breast.

IMPRESSION:

1.  Incomplete:  Need additional evaluation (BIRADS 0)

RECOMMENDATION:  Spot magnification views in the right XCCL and right ML should be performed.  Additionally, possible right breast ultrasound should be performed.

In layman's terms, the report recommended "a repeat mammogram and possible ultrasound."

Following the report's recommendations, Jones received a second mammogram that same day.  The July 14 mammogram revealed an "irregular" "[m]ass with calcifications span[ning] 3 cm in the right axillary tail."  Because Dr. Bauer deemed the results of this second mammogram "[s]uspicious," she recommended an "[u]ltrasound-guided core biopsy of the mass."  The subsequent

biopsy, performed on August 4, 2014, resulted in a diagnosis of cancer in Jones's right breast.  Jones thereafter underwent treatment for the condition, the cost of which was billed to Golden Rule.

> ### 2.    *Golden Rule refused to cover Jones's breast-cancer treatment because of the Policy's preexisting-condition coverage exclusion.*

Upon being billed for Jones's breast-cancer treatment, Golden Rule initiated a review of Jones's medical records to determine whether her condition fell within § 12 of the Policy, which excludes coverage for preexisting conditions.  Section 5 of the Policy defines a "preexisting condition" as a condition

(A)    For which medical advice, diagnosis, care, or treatment was recommended or received within the 60 months immediately preceding the date the *covered person* became insured under this *policy*;

(B)    That, in the opinion of a qualified *doctor*,

(1)    Began prior to the date the *covered person* became insured under this *policy*; or

(2)    Manifested symptoms that would have caused an ordinarily prudent person to seek medical advice, diagnosis, care, or treatment within the 60 months immediately preceding the date the *covered person* became insured under this *policy*; or

(C)    A pregnancy existing on the effective date of coverage.

5

The Policy defines the term "doctor" as "a duly licensed practitioner of the medical arts . . . currently licensed by the state in which the services are provided." All of the medical care relevant to this case took place in the state of Georgia.

Golden Rule retained Michael Dubois, M.D., a doctor licensed in the state of Indiana, but not in Georgia, as a consultant who rendered medical opinions relevant to insurance coverage. In December 2014, Dr. Dubois issued an opinion that Golden Rule could deny coverage to Jones under § (B)(1) of the Policy's preexisting-condition definition because he concluded that her cancer began prior to the Policy's effective date. He further opined that Golden Rule could deny coverage based on § (A) of the Policy's preexisting-condition definition because Jones's April 2014 mammogram "constitutes medical advice, diagnosis, care, or treatment within the 60 months immediately preceding" the Policy's effective date. On the basis of Dr. Dubois's opinion, Golden Rule denied Jones coverage for her breast-cancer treatment.

## B.    Procedural background

Jones timely filed suit in the United States District Court for the Northern District of Georgia based on the diversity of citizenship between the parties. *See* 28 U.S.C. § 1332. She alleged that Golden Rule had committed (1) a breach of contract, (2) a breach of its duty of good faith and fair dealing, and (3) statutory and common-law bad faith by denying her coverage. Based on those allegations,

6

Jones seeks contract and/or statutory damages, punitive damages, and attorney's fees.

Golden Rule moved for summary judgment, arguing that Dr. Bauer's May 2014 report contained "medical advice," recommended "care," or itself constituted "care" for Jones's breast cancer. Accordingly, Golden Rule contended that its denial of coverage was justified under § (A) of the preexisting-condition definition. The district court granted Golden Rule's motion, but based its decision on different reasoning. *Jones v. Golden Rule Ins. Co.*, 275 F. Supp. 3d 1361, 1372 (N.D. Ga. 2017).

First, the district court held that § (A) of the policy's preexisting-condition definition justified Golden Rule's denial of coverage because Dr. Bauer's report constituted a recommendation to get a "diagnosis" of Jones's breast cancer. *Id.* at 1368. Second, although Golden Rule did not move for summary judgment based on § (B)(1) of the preexisting-condition definition, the court held that that prong also justified the insurance company's denial of coverage by inferring that the calcifications identified by Dr. Bauer in the April 2014 mammogram establish that Jones's cancer was present prior to the Policy's effective date. *Id.* at 1371–72. This timely appeal followed.

## II.    ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment is appropriate if there is no genuine dispute regarding any material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In conducting this review, we view all the evidence and draw all reasonable factual inferences in favor of the nonmoving party. *Strickland*, 592 F.3d at 1154.

## B.    Georgia contract law

The parties agree that Georgia law governs this contract dispute. As with other contracts, the construction and interpretation of an insurance policy is a question of law for the court to decide. *Haulers Ins. Co. v. Davenport*, 810 S.E.2d 617, 619 (Ga. Ct. App. 2018). Ordinary rules of contract construction govern the interpretation of an insurance contract. *Id.* "Where the contractual language is explicit and unambiguous, 'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.'" *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 424 (Ga. 2016) (quoting *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008)).

But "[w]here a term of a policy of insurance is susceptible to two or more constructions, even when such multiple constructions are all logical and reasonable, such [a] term is ambiguous and will be strictly construed against the insurer as the drafter and in favor of the insured." *Federated Mut. Ins. Co. v.*

8

*Ownbey Enters., Inc.*, 627 S.E.2d 917, 921 (Ga. Ct. App. 2006) (quoting *Ga. Farm Bureau Mut. Ins. Co. v. Meyers*, 548 S.E.2d 67, 69 (Ga. Ct. App. 2001)); *see also* Ga. Code Ann. § 13-2-2(5) ("If the construction [of a contract] is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred . . . .").

**C.    Golden Rule cannot deny coverage for Jones's breast-cancer treatment based on the Policy's preexisting-condition definition.**

*1.    No "qualified doctor" has rendered an "opinion" that would allow Golden Rule to deny coverage to Jones under § (B)(1) of the Policy's preexisting-condition definition.*

Section (B)(1) of the Policy's preexisting-condition definition excludes coverage for conditions "[t]hat, in the opinion of a qualified *doctor*, . . . [b]egan prior to" the Policy's effective date on June 26, 2014.  The Policy defines the term "doctor" as "a duly licensed practitioner of the medical arts . . . currently licensed by the state in which the services are provided."  Fortunately for Jones and unfortunately for Golden Rule, Dr. Dubois is not licensed in the state of Georgia, where Jones was diagnosed and treated.

Notwithstanding the fact that Dr. Dubois does not meet the Policy's definition of a "doctor," the district court held that § (B)(1) nevertheless excludes coverage for Jones's breast-cancer treatment because the doctors who performed Jones's mammograms and biopsy and diagnosed her breast cancer were licensed in Georgia.  *Jones*, 275 F. Supp. 3d at 1372.  Inferring that "the breast abnormality

9

identified [by the April 2014 mammogram] ultimately was diagnosed by a qualified doctor as breast cancer," the court found that § (B)(1) applied to Jones's treatment. *Id.* at 1371.

The district court's inference is not an implausible one, but it does not change the fact that none of the doctors who diagnosed and treated Jones's breast cancer rendered any opinion that appears in the record *as to when the condition began*. Because the court's inferential reasoning cannot substitute for the "opinion" by a "qualified doctor" that § (B)(1) calls for, Golden Rule cannot deny coverage to Jones based on that subsection of the preexisting-condition definition.

**2.    *Section (A) of the Policy's preexisting-condition definition is ambiguous and must be construed in Jones's favor.***

The district court also held that Golden Rule could deny coverage for Jones's breast-cancer treatment based on § (A) of the Policy's preexisting-condition definition because Dr. Bauer's report issued after Jones's April 2014 mammogram "'recommended' medical 'diagnosis' 'for' what ultimately was diagnosed as breast cancer." *Jones*, 275 F. Supp. 3d at 1368. Jones argues that the contractual terms "diagnosis," "recommended," and "for" are all ambiguous and can be reasonably construed in a manner that would require coverage for her breast-cancer treatment. Golden Rule argues that Jones failed to raise this

argument below and therefore forfeited the issue on appeal.  Regardless, the insurance company maintains that § (A) is unambiguous and precludes coverage.

### a.    Jones raised below the ambiguity of § (A).

Before the district court, Jones argued that § (A) was ambiguous because §§ (A) and (B)(1) could be read either conjunctively or disjunctively.  Golden Rule contends that Jones forfeited the right to raise any other ambiguities in § (A) on appeal.  But Jones also put forth below her interpretation of the key undefined terms in § (A), including the words "diagnosis" and "recommended."  Jones continues to press her interpretation of those terms on appeal.

"'[P]arties are not limited to the precise arguments that they made below'" and may present a new argument on appeal "to support what has been [a] consistent claim." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992)).  Jones's consistent claim has been that § (A) of the Policy's preexisting-condition definition, by its terms, does not bar coverage for her breast-cancer treatment.  To the extent that Jones's analysis of § (A)'s key terms is any different on appeal, she is simply making a new argument in further support of her consistent claim that she is entitled to reimbursement from Golden Rule for the medical care that she received.  We therefore find no forfeiture of this issue on appeal.

11

### b.    *"Diagnosis" is ambiguous as used in § (A).*

The district court acknowledged that the term "diagnosis" could refer to either (1) "a diagnostic procedure," or (2) "a diagnostic conclusion." *Jones*, 275 F. Supp. 3d at 1368 (quoting *LoCoco v. Med. Sav. Ins. Co.*, 530 F.3d 422, 477 n.1 (6th Cir. 2008)); *see also Webster's Third New International Dictionary* 622 (2002) (defining the term "diagnosis" as "the art or act of identifying a disease from its signs and symptoms" and as "the decision reached" through diagnostic procedures). But the court held that the term "diagnosis" as used in § (A) could not mean a "diagnostic conclusion" because "[i]t would be unnatural to read the policy as contemplating that a diagnostic result be 'recommended.'" *Jones*, 275 F. Supp. 3d at 1368 (quoting *LoCoco*, 530 F.3d at 477 n.1). The dissent agrees with the district court's analysis based on its observation that no grammatical "article" appears before the word "diagnosis" in § (A). Dissent at 31–34. Despite the dissent's impressive explanation regarding the complexities of English grammar, we find that the meaning of the word "diagnosis" in § (A) is at best ambiguous. And if the Policy's language is ambiguous, Golden Rule loses. *See Federated Mut. Ins. Co. v. Ownbey Enters., Inc.*, 627 S.E.2d 917, 921 (Ga. Ct. App. 2006).

To start with, reading the word "diagnosis" to solely mean a "diagnostic procedure" is incompatible with the overall structure of the Policy's preexisting-

condition definition.  Whereas § (B)(1) of the definition covers unknown conditions that existed prior to the Policy's effective date, § (A) covers conditions that were in some way known to the insured on the effective date.  Our conclusion about §§ (A) and (B)(1)'s differing structural roles within the preexisting-condition definition is reinforced by the fact that § (B)(2), which is not at issue in this case, covers conditions that "in the opinion of a qualified *doctor*[,] . . . [m]anifested symptoms [prior to the effective date] that would have caused an ordinarily prudent person to seek medical advice, diagnosis, care or treatment." This provision is presumably intended to exclude coverage for conditions about which the insured remained willfully ignorant.

Viewing the definition of a "preexisting condition" as a whole, each section and subsection thus appears to cover different gradations of knowledge that an insured might possess with regard to a preexisting condition.  The structure of the preexisting-condition definition cannot be explained, as the dissent suggests, by a simple dichotomy based on whether a doctor has reviewed the condition in question.  Dissent at 31.  Otherwise, there would be no need for § (B) to be split into separate subsections.

With the overall structure of the preexisting-condition definition in mind,  a condition for which a diagnostic procedure has been recommended but not yet received is not yet a known condition.  Interpreting the term "diagnosis" as used in

13

§ (A) to mean a "diagnostic procedure" thus stretches that prong of the preexisting-condition definition to reach conditions that more logically fall under § (B)(1).

Along similar lines, the other terms that surround the word "diagnosis" in § (A) refer to medical procedures that are applied to known conditions. "Advice," for example, means "an opinion or recommendation offered as a guide to action, conduct, etc." or a "[r]ecommendation regarding a decision or course of conduct; specif[ically], that of professional counsel." *Bergan v. Time Ins. Co.*, 395 S.E.2d 361, 363 (Ga. Ct. App. 1990) (first alteration in original) (quoting *Random House Dictionary of the English Language* (2d ed. 1987) and *Webster's New International Dictionary* (2d ed. 1961)). The words "care" and "treatment" similarly "refer to something done in the application of the curative arts, whether by drugs or other therapy, with the end in view of alleviating a pathological condition." *Mut. Life Ins. Co. of N.Y. v. Bishop*, 209 S.E.2d 223, 225 (Ga. Ct. App. 1974).

Although doctors assign a "diagnostic conclusion" to a known condition, they order a "diagnostic procedure" for unknown ones. The linguistic canon of *noscitur a sociis* stands for the proposition that "[w]ords, like people, are judged by the company they keep." *Anderson v. Se. Fidelity Ins. Co.*, 307 S.E.2d 499, 500 (Ga. 1983). Because the words that surround "diagnosis" in § (A) refer to medical

14

procedures applied to known conditions, we conclude that the better reading of the word "diagnosis," in context, is a "diagnostic conclusion."

The dissent faults us for relying on *Bergen*'s definition of the term "advice" without paying proper heed to the facts of that case. Dissent at 35–36. In *Bergen*, a patient visited her doctor prior to her insurance policy's effective date because of symptoms of what she believed to be a bladder infection. 395 S.E.2d at 362. Upon examining the patient, the doctor discovered a pelvic mass and advised the patient to get an ultrasound and see a gynecologist. *Id.* Subsequent evaluation led to a diagnosis of ovarian cancer. *Id.* The *Bergen* court approved the insurer's denial of coverage based on a preexisting-condition definition that was similar to § (A) (but which lacked analogues to §§ (B)(1) or (B)(2)) because the first doctor who evaluated the patient "'advised' her to see a gynecologist and to have an ultrasound examination." *Id.* at 363.

According to the dissent, these facts show that "advice" can be given concerning an unknown condition. Dissent at 35. But the patient in *Bergen* sought medical evaluation for a *known* condition, albeit one that she inaccurately self-diagnosed as a bladder infection. *Id.* at 362. Jones, in contrast, had no inkling that anything was medically amiss when she went in for her routine screening mammogram in April 2014. And although that screening mammogram identified calcifications that are sometimes associated with breast cancer, a follow-up

15

mammogram might very well have revealed that those calcifications were completely benign.

There is also no grammatical reason why the word "recommended" must necessarily be read in conjunction with the word "diagnosis" as the district court did. *See Jones*, 275 F. Supp. 3d at 1368.  The words "recommended" and "received" both make perfect sense when coupled with the words "care" or "treatment."  So even if the court is correct that a "diagnostic result" cannot logically be "recommended," *id.*, the word is not robbed of all meaning or utility in the sentence as a whole.

Indeed, coupling "recommended" with the word "advice" makes even less sense than pairing it with the word "diagnosis."  The Georgia courts have defined the word "advice" as "an opinion or recommendation offered as a guide to action," so "advice" as used in § (A) can only be "received," not "recommended," without introducing a redundancy into the sentence.  *See Bergan*, 395 S.E.2d at 363 (quoting *Random House Dictionary of the English Language* (2d ed. 1987)).

Accordingly, the district court's definition of the word "diagnosis" does not eliminate the linguistic problem that the court itself introduced by insisting that both "recommended" and "received" must apply to all four of the predicate words in the sentence.  The better reading, therefore, is that the term "recommended"

16

does not apply to either the words "advice" or "diagnosis" and thus does not eliminate one of the two plausible definitions for "diagnosis."

The dissent takes issue with this reading of the definition in two respects. It first argues that a canon of statutory interpretation dictates that the terms "recommended" and "received" both be read as applicable to all of the terms in the list that they follow. Dissent at 36–37. But the cases on which the dissent relies for that proposition involve singular phrases interpreted in conjunction with a preceding list, not a phrase like "recommended or received" that includes two terms separated by the disjunctive "or." *See Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920) (reading the term "not domiciled in Porto Rico" in conjunction with a preceding list); *United States v. McDaniel*, 631 F.3d 1204, 1209 (11th Cir. 2011) (reading the term "proximate result" in conjunction with a preceding list). An interpretation of the preexisting-condition definition at issue here does not violate the canon that the dissent references so long as each term that precedes the phrase "recommended or received" has meaning when combined with one of those two words.

The dissent also disagrees that reading the term "recommended" in conjunction with "advice" creates a redundancy in § (A), reasoning that the combination of those terms avoids the possibility of a patient attempting to circumvent the preexisting-condition provision by claiming that she had not

17

"received" "advice" memorialized in a letter.  Dissent at 36–38.  But a doctor "gives" advice when she memorializes it in a letter; she does not "recommend" it.  The dissent's explanation thus does not rectify the redundancy that is introduced into the preexisting-condition definition by insisting that all of the predicate words in § (A) be given meaning when combined with the word "recommended."

In any event, Jones has offered a definition of the word "recommended" that fits with the "diagnostic conclusion" definition of "diagnosis."  She points out that "recommend" can mean "to mention or introduce as being worthy of acceptance, use, or trial."  *Webster's Third New International Dictionary* 1897 (2002).  A doctor might thus put forward a "diagnostic conclusion" as "worthy of acceptance" before it is officially confirmed.  If, for example, a doctor identifies a suspicious mass during a physical examination or on a mammogram, she might propose cancer as a provisional diagnosis that could be confirmed only with a biopsy.  In that sense, a prebiopsy medical report that specifically identifies cancer as the suspected cause of observed symptoms can be said to contain a "recommended" diagnostic conclusion.

Moreover, had Golden Rule intended § (A) to exclude coverage when a preapplication diagnostic procedure or screening ultimately reveals a pathological condition, it could have done so explicitly.  For example, Golden Rule could have provided something to the effect that "any diagnostic procedure or screening

18

undergone by the insured within 60 months prior to coverage that results in medical care or treatment during the term of the Policy will be considered a preexisting condition." But Golden Rule did not so provide, and we render no judgement on whether such a broad preexisting-condition provision would be enforceable.

In sum, we conclude that "diagnostic conclusion" is a plausible definition of the word "diagnosis" as used in § (A) of the Policy's preexisting-condition definition. It might even be a better definition of the term than "diagnostic procedure" given § (A)'s purpose within the provision's overall structure of excluding known conditions from coverage. And because the phrase "diagnostic conclusion" is one of two plausible definitions of the term "diagnosis," and the one that favors Jones, we must adopt that definition in construing § (A). *See Federated Mut. Ins. Co. v. Ownbey Enters., Inc.*, 627 S.E.2d 917, 921 (Ga. Ct. App. 2006).

### 3.    *Golden Rule cannot deny Jones coverage based on § (A) of the Policy's preexisting-condition definition.*

Jones's April 2014 mammogram was the only medical procedure related to her ultimate diagnosis and treatment for breast cancer that she received prior to the Policy's effective date on June 26, 2014. Dr. Bauer's report that memorializes the results of that procedure contains no diagnostic conclusion. Indeed, it could not have because, according to Dr. Dubois's deposition testimony, a final diagnosis of cancer is not possible until a biopsy is conducted. Nor did Dr. Bauer offer any

provisional diagnosis as "worthy of acceptance" because her report does not even mention the word cancer. *See Webster's Third New International Dictionary* 1897 (2002). To the extent, therefore, that § (A) can be read to exclude coverage based on a recommended "diagnostic conclusion" of breast cancer, Dr. Bauer's report contains no such recommendation.

Moreover, even if the term "diagnosis" were deemed to unambiguously mean "diagnostic procedure," the mammogram that Jones underwent in April 2014 was solely for screening purposes, not for what one would fairly characterize as a diagnostic procedure intended to ascertain an unknown "condition." The term "condition" is not defined in the Policy, but the most applicable dictionary definition of the word is "the physical status of the body as a whole . . . or one of its parts—usu[ally] used to indicate [an] abnormality." *Webster's Third New International Dictionary* 473 (2002).

Dr. Bauer recommended follow-up procedures after the April 2014 mammogram not because she had identified a medical ailment or abnormality, but simply because the density of Jones's breast tissue made it "hard to see" any "small masses (cysts or tumors)" that might have been present and because of "[l]inearly distributed calcifications" in Jones's right breast. Dr. Dubois testified in his deposition that calcifications "suggest[] the possibility of cancer" and are "related to the metabolism of . . . cancer" in the same way "that pain would be part

20

of a bone fracture." But he acknowledged that calcifications do not necessarily indicate the presence of cancer and can appear "in normal breasts," i.e., breasts that are unaffected by any "condition."

### 4. Golden Rule failed to renew its argument that Dr. Bauer's report contained "medical advice," recommended "care," or itself constituted "care."

In its motion for summary judgment, Golden Rule argued that § (A) of the Policy's preexisting-condition definition authorized its denial of coverage because Dr. Bauer's report contained "medical advice" or a recommendation that Jones receive "care" in the form of a follow-up mammogram. The motion further contended that the April 2014 mammogram and its associated report themselves constituted medical "care." Golden Rule does not renew those arguments on appeal, instead defending the district court's alternative bases for granting summary judgment in its favor.

An appellee's "failure to brief [an] issue abandons it for the purposes of th[e] appeal." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 n.16 (11th Cir. 1995); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–83 (11th Cir. 2014) (deeming a party's failure to address the alternative grounds on which a district court based its judgment as an abandonment of any argument concerning those alternative holdings).

21

Golden Rule attempted during oral argument to resuscitate the arguments that it had made below in support of its motion.  But such a belated attempt to raise an argument does not alter the abandonment analysis.  *See Edwards v. Niagara Credit Sols., Inc.*, 584 F.3d 1350, 1352 n.2 (11th Cir. 2009) (holding that a party had abandoned an argument that it made before the district court by failing to renew the argument in its initial brief on appeal).  Accordingly, Golden Rule has abandoned any alternative arguments for why § (A) of the Policy's preexisting-condition definition authorizes the company's denial of coverage for Jones's breast-cancer treatment.

But even if Golden Rule had preserved its argument that Jones had received "medical advice" in April 2014, it would not have prevailed on that theory for the two reasons discussed above.  The first is that the facts of this case are clearly distinguishable from those in *Bergen* because Jones, unlike the patient in that case, did not seek medical evaluation for any symptoms.  395 S.E.2d 361, 362 (Ga. Ct. App. 1990).  Second, and relatedly, the advice that she received concerned calcifications that are a potential indicator of cancer, but that are often benign, and cannot in and of themselves be fairly considered a "condition."  Accordingly, this argument would have fared no better than the arguments that Golden Rule properly raised on appeal.

22

The heart of Golden Rule's problem in this case is that Jones had no "condition" when she had her mammogram in April 2014 "[f]or which medical advice, diagnosis, care, or treatment was recommended or received."  She simply had her annual routine-screening mammogram at a time when she exhibited no signs or symptoms of breast cancer.  Because Jones had no knowledge of any "condition" (i.e., abnormality) for which she was seeking "advice, diagnosis, care, or treatment" prior to the effective date of the Policy, she is entitled to coverage.

**D.    Entry of judgment for Jones is proper.**

Despite the absence of any factual disputes in this case, Jones did not file a cross-motion for summary judgment below.  Nevertheless "it is occasionally proper for an appellate court to enter summary judgment for the non-moving party . . . in the rare case in which it is very clear that all material facts are before the reviewing court." *E.C. Ernst, Inc. v. Gen. Motors Corp.*, 537 F.2d 105, 109 (5th Cir. 1976) (as a pre-1981 5th Circuit decision, *Ernst* is binding precedent in our circuit per *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981)); *see also Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1199–1200, 1204 (9th Cir. 2015) (reversing the district court's grant of summary judgment in favor of the appellee and remanding with instructions to enter judgment for the nonmoving party); *Albino v. Baca*, 747 F.3d 1162, 1177 (9th Cir. 2014) (en banc) (same); *Ortega Candelaria v. Orthobiologics LLC*, 661 F.3d 675, 681 n.10 (1st Cir. 2011) ("Even

23

in the absence of a cross-motion for summary judgment, we may *nostra sponte* grant partial summary judgment to the non-moving party provided that 'both sides have had an opportunity to present evidence, the facts are uncontroverted, and the proper disposition is clear.'" (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 366 (6th Cir. 1993))).  And in reviewing a district court's *sua sponte* entry of judgment, this court has held that "where a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided." *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) (per curiam).

We note that the dissent disagrees with our grant of summary judgment to Jones, stating that we have offered no explanation for why the record demonstrates that she is entitled to coverage.  Dissent at 41.  But Golden Rule has had every incentive to raise any and all legal arguments that could support the district court's grant of summary judgment in its favor.  The evidentiary record is fully developed, and no genuine disputes of material fact exist.  Yet Golden Rule has failed to put forth any persuasive argument for why the Policy authorized its denial of coverage.

Given the fairly long lineage of this case, the absence of factual disputes, and Golden Rule's failure to assert any other reason besides the preexisting-condition provision for the denial of coverage, we do not believe that a remand of Jones's breach-of-contract claim serves either the principle of judicial economy or

24

the rendering of a just result.  Accordingly, we direct the district court *nostra sponte* to grant summary judgment in Jones's favor on her breach-of-contract claim.

## III.    CONCLUSION

Golden Rule wrongly denied coverage for Jones's breast-cancer treatment. It has submitted no opinion from a qualified doctor, as defined by the policy, that concludes that her breast cancer began prior to the Policy's effective date. Moreover, Golden Rule has submitted no evidence that Jones had any "condition" for which a diagnosis procedure was "recommended" prior to the Policy's effective date.  The district court accordingly erred in granting summary judgment for Golden Rule.  For all of these reasons, we **REVERSE** and **REMAND** with instructions for the district court to grant summary judgment in favor of Jones on her breach-of-contract claim and for any further proceedings not inconsistent with this opinion.

JULIE CARNES, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's decision to reverse the district court's order to the extent that the latter grants summary judgment to Golden Rule based on § 5(B) of the policy. Under that provision, one basis for finding that an insured had a disqualifying preexisting condition is the opinion of a qualified doctor that the insured's condition began prior to the date of coverage. Although Golden Rule proffered such an opinion from its doctor, the doctor was not licensed in the State of Georgia and hence could not count as a qualified doctor for purposes of this provision of the policy.

There is, however, a second provision defining a preexisting condition: § 5(A). The district court concluded that summary judgment for Golden Rule was also warranted under this provision. I agree with this part of the district court's ruling. But the majority does not, and for this reason I respectfully dissent from that part of the majority opinion reversing summary judgment based on § 5(A).

Moreover, the majority not only reverses the district court's grant of summary judgment, but it also "*nostra sponte*" awards summary judgment to Jones—even though Jones never moved for summary judgment before the district court and even though Jones has never asked us to take this step. I also dissent as to the majority's unilateral decision to grant Jones summary judgment.

26

## I.    BACKGROUND

Plaintiff Dawn Jones is a sophisticated litigant, with an impressive resume. She has a nursing degree from the University of Virginia, a Masters degree in nursing from Georgetown University, and a law degree from Georgia State University.  Early in her career, she worked for a law firm that handled insurance defense cases and, for the seven years preceding her purchase of a health insurance policy with Golden Rule, she worked for a prestigious law firm in Atlanta on tort litigation.

But in April 2014, she decided to strike out on her own and begin the solo practice of law.  She gave her 30-day notice on April 1 and left the firm at the end of the month.  During her tenure with the firm, she had an employer-sponsored health insurance policy.  She could have continued with that policy under COBRA[1] after leaving the firm, but she declined to do so because of how expensive she thought the premiums would be.  Instead, she began a search for a more affordable short-term policy.  And she found one:  a health care policy with Golden Rule that carried a premium of only $112 a month.  But of course there is no free lunch, and along with that relatively inexpensive premium came a very tough preexisting-condition exclusion.

---

[1] Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 (codified at 29 U.S.C. §§ 1161–1168).  Under COBRA, the former employee is required to pay both her and her former employer's portion of the premium.

Prior to signing on with Golden Rule, however, and while still employed with her law firm and under the firm's health insurance plan, Jones underwent a routine screening mammogram on April 16, 2014, administered by Dr. Amanda Bauer. Two months later, on June 25, 2014, she applied for and obtained a short-term insurance policy with Golden Rule, with an effective date of June 26, 2014. At that time, according to Jones's deposition testimony, she had still not received a report summarizing the results of her mammogram that had occurred two months earlier. She testified that she had requested the results of that test from her doctor, but that despite her efforts she never got a copy of the report prior to applying for insurance with Golden Rule. Finally, on July 14, a couple of weeks after enrolling with Golden Rule and now three months after the mammogram, Jones visited Dr. Bauer's office in person and obtained a copy of the report, which had been prepared by Dr. Bauer two months earlier on May 13, 2014.

The report found nothing suspicious in the left breast: "[n]o dominant masses, calcifications, or indirect signs of malignancy . . . in the left breast." The right breast was another matter. The report indicated the finding of "[l]inearly distributed calcifications" in Jones's right breast. Ultimately, Dr. Bauer's impression was "[i]ncomplete," and she concluded that Jones "[n]eed[ed]

28

additional evaluation (BIRADS 0)."[2]  Accordingly, Dr. Bauer recommended that "[s]pot magnification views in the right XCCL and right ML should be performed" and "possibl[y] [a] right breast ultrasound."

The same day she obtained the report, July 14, Jones asked for and received a second mammogram as recommended in Dr. Bauer's report.  This second mammogram, which was coded as a "Mammogram Diagnostic Digital," revealed an irregular mass in Jones's right breast.  The diagnostic report indicated that there was a high suspicion of breast cancer, and the doctor recommended a biopsy.  In August, doctors biopsied the mass and, unfortunately, Jones was diagnosed with breast cancer.  Jones then received surgery, chemotherapy, and other care to treat her cancer.

As noted, Jones's policy with Golden Rule ("the Policy") excludes coverage for preexisting conditions under § 5(A).  Jones submitted the costs for her breast cancer treatment to Golden Rule.  Golden Rule concluded that coverage of Jones's breast cancer was excluded under this preexisting-condition exclusion based on the first mammogram and report.  Accordingly, Golden Rule denied coverage of Jones's claims.

---

[2]  A BIRADS score indicates the level of suspicion of breast cancer.  The higher the score, the greater the suspicion.  A BIRADS score of 0 indicates that additional imaging evaluation is needed.

II.    **DISCUSSION**

A.    **The Recommendation of a Diagnostic Procedure by Dr. Bauer**

In relevant part, the Policy states:

"Preexisting condition" means a condition:

> (A)    For which medical advice, <u>diagnosis</u>, care, or treatment <u>was</u> <u>recommended</u> or received within the 60 months immediately preceding the date the covered person became insured under this policy;

(Emphasis in original omitted; emphasis in above text added.)  The district court

held that Jones's breast cancer was excluded under § 5(A) of the Policy as a

preexisting condition because Dr. Bauer recommended that Jones undergo a further

diagnostic procedure to identify the cause of the concerning observations in the

first mammogram—a procedure that ultimately revealed the existence of Jones's

breast cancer, the condition for which Jones seeks reimbursement.  That is, Dr.

Bauer <u>recommended</u> <u>diagnosis</u> of the unknown condition that sadly turned out to

be the cancer at issue here.  Like the district court, I conclude that this triggers the

preexisting-condition exclusion in § 5(A).

The majority disagrees, concluding (1) that reading "diagnosis" to mean

diagnostic procedure is inconsistent with the Policy's structure and (2) that because

the words surrounding "diagnosis" in § (A) apply only to known conditions, so

should "diagnosis."  As to the first point, I disagree that "reading the word

'diagnosis' to mean a 'diagnostic procedure' is incompatible with the overall

30

structure of the Policy's preexisting-condition definition." Maj. Op. at 12–13. It is the majority's conjecture that § 5(B)—which excludes coverage for any condition that a qualified doctor opines either began prior to the date the covered person became insured under the Policy or manifested symptoms that would have caused an ordinarily prudent person to see a doctor—"covers unknown conditions." *Id.* at 13. From that surmise, the majority then jumps to the conclusion that § 5(A) must then necessarily "cover[] conditions that were in some way known to the insured." *Id.* Yet nowhere does the Policy say such things. Just as plausibly, § 5(A) could simply cover situations where the insured, whatever his or her state of awareness, goes to a doctor and § 5(B) those situations where the insured does not, even though in the latter the insured may know or suspect full well his malady. In fact, the focus of § 5(B)(2) is on whether or not the insured had symptoms "that would have caused an ordinarily prudent person *to seek* medical advice, diagnosis, care, or treatment"—in other words, whether a reasonable person *would have gone to the doctor.* (Emphasis added.) Nothing in § 5(B) has anything to do with the insured's knowledge about his condition as the majority insists.

Moreover, in terms of a textual analysis, whether "diagnosis" means diagnostic procedure or diagnostic conclusion depends upon whether it is used as a mass noun. "A mass noun (sometimes called a *noncount noun*) is one that denotes something uncountable, either because it is abstract {cowardice} {evidence} or

because it refers to an aggregation of people or things taken as an indeterminate whole {luggage} {the bourgeoisie}." Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 22 (2016) (emphasis and brackets in original). Importantly, "[s]ingular count nouns **cannot be used alone.** They must have a **determiner**."[3] *Count Nouns*, British Council, https://learnenglish.britishcouncil.org/ar/english-grammar/count-nouns (last visited Aug. 8, 2018) (emphasis in original). (*E.g.*, "I bought a/his/that/the dog," not "I bought dog.") Mass nouns, however, "can stand alone {**music is** more popular than ever} or with a determiner other than an indefinite article (*some* music or *the* music but generally not *a* music)." Garner, *supra* at 22 (emphasis and brackets in original). And "singular mass nouns don't take an indefinite article." *Id.*

When used as a mass noun, "diagnosis" can mean only diagnostic procedure. *See Diagnosis*, Merriam-Webster Learner's Dictionary, http://www.learnersdictionary.com/definition/diagnosis (last visited Aug. 14, 2018) ("[noncount]: the act of identifying a disease, illness, or problem by examining someone or something * * * [count]: a statement or conclusion that describes the reason for a disease, illness, or problem" (brackets in original)); *see also Diagnosis*, Oxford Living Dictionaries,

---

[3] "Determiners are words which come at the beginning of the noun phrase" that indicate "whether the noun phrase is specific or general." *Determiners and quantifiers*, British Council, https://learnenglish.britishcouncil.org/ar/english-grammar/determiners-and-quantifiers (last visited Aug. 14, 2018). Plural count nouns and proper nouns do not require a determiner.

https://en.oxforddictionaries.com/definition/diagnosis (last visited Aug. 14, 2018)

(distinguishing between "diagnosis" as a mass noun when it refers to "[t]he

identification of the nature of an illness or other problem by examination of the

symptoms" and as a count noun when it refers to a diagnostic result (*e.g.*, "a

diagnosis of Crohn's disease was made")).

Here, § 5(A) uses "diagnosis" as a mass noun. Section 5(A) defines

preexisting condition to include any condition "[f]or which . . . diagnosis . . . was

recommended or received." Section 5(A) uses "diagnosis" as a singular noun and,

because it lacks a determiner, as a singular mass noun meaning diagnostic

procedure. Common sense supports this. When used without a determiner,

"diagnosis" is commonly understood to refer to a diagnostic procedure. For

example, if a doctor says to a patient, "I recommend diagnosis," the patient would

understand that the doctor was recommending some procedure or testing to

investigate and identify what the patient's condition is. No one would think that

the doctor was recommending a particular conclusion about what the condition is.

In fact, that's precisely how the Policy uses the word "diagnosis" in other

sections. Whenever the Policy means diagnostic conclusion, it adds a determiner

and uses "diagnosis" as a count noun. For example, the Policy requires that

medical bills include "*the* diagnosis for the condition treated." (Emphasis added.)

And the Policy defines "Medical necessity," to mean treatment that is

33

"[a]ppropriate and consistent with *the* diagnosis." (Emphasis added.) But when the Policy refers to diagnostic procedure, it uses "diagnosis" without any determiner. For example, the Policy defines "Hospital" as an institution that "[p]rovides organized facilities and equipment for diagnosis and treatment of acute medical, surgical, or mental conditions," and "Telemedicine" as "health care delivery, diagnosis, consultation, treatment, or transfer of medical data by means of audio, video, or data communications." Similarly, the Policy excludes coverage "[f]or diagnosis or treatment of nicotine addiction."

Because "diagnosis" as a mass noun unambiguously means only diagnostic procedure, § 5(A) excludes coverage for Jones's breast cancer. Dr. Bauer recommended diagnosis of the calcifications in Jones's right breast in her May 2014 report, within sixty months of when the Policy became effective on June 26, 2014. And Dr. DuBois gave uncontroverted testimony that those calcifications were ultimately the same condition as Jones's breast cancer.[4] Thus, Jones's breast cancer is "a condition . . . [f]or which . . . diagnosis . . . was recommended . . . within the 60 months immediately preceding the date" Jones became insured under the Policy, and is therefore excluded as a preexisting condition under § 5(A).

---

[4] Although Dr. DuBois may not meet the Policy's definition of "qualified doctor" as needed for § 5(B)(1) to apply, he was nevertheless sufficiently qualified to testify as a medical expert. Indeed, Jones never challenged in the district court Dr. Dubois's qualifications under *Daubert* and offers no facts to show that he is unqualified under Fed. R. Evid. 702. And, at the time Dr. DuBois offered his opinions in this case, he was a licensed and board-certified doctor, had been practicing medicine for at least two decades, and had experience reading mammogram reports.

Second, the majority reasons that because "the other terms that surround the word 'diagnosis' in § (A) refer to medical procedures that are applied to known conditions," "diagnosis" must do so as well.  Maj. Op. at 14–15.  And because doctors can only "assign a 'diagnostic conclusion' to a known condition," "diagnosis" has to mean diagnostic conclusion.  *Id.* at 14.  To reach this conclusion, the majority relies on the definition of "advice" from *Bergan v. Time Insurance Company*, 196 Ga. App. 78 (1990).[5]  *Id.* at 14 (defining "advice" as either "an opinion or recommendation offered as a guide to action, conduct, etc." or a "[r]ecommendation regarding a decision or course of conduct; specif[ically], that of professional counsel."  (brackets in original) (quoting *Bergan*, 196 Ga. App. at 80)).  Notably, nothing in *Bergan*'s definition of advice suggests that advice can only be given for known conditions.  To the contrary, *Bergan* squarely held that a person could receive advice for an *unknown* condition.  The appellant in *Bergan* argued "that because [her] disease was not diagnosed prior to commencement of the policy period, she received no . . . 'advice'" and her condition was not excluded under her policy's preexisting-condition exclusion.  196 Ga. App. at 80.  The Georgia Court of Appeals rejected that contention, as the court held that the appellant had received "advice" twice:  when her first doctor "'advised' her to see a gynecologist and to have an ultrasound examination," and when her second

---

[5]  I agree with the majority that because this is a diversity case, Georgia law governs.

doctor "'advised' further evaluation and treatment of the problem by means of an exploratory laparotomy." *Id.* It was not until after the laparotomy that the appellant's condition was identified. *Id.* at 79.

Indeed, even assuming that "care" and "treatment" apply only to known conditions (a debatable proposition in itself), "advice" does not. So the *noscitur a sociis* canon is not determinative here, as at least one word around "diagnosis" does not apply only to known conditions.

In further parsing the language of the provision, the majority also concludes that "the term 'recommended' does not apply to either the words 'advice' or 'diagnosis.'" Maj. Op. at 16–17. I must again disagree. The majority asserts that "there is no grammatical reason why the word 'recommended' must necessarily be read in conjunction with the word 'diagnosis.'" *Id.* at 16. But there is: "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *United States v. McDaniel*, 631 F.3d 1204, 1209 (11th Cir. 2011) (quoting *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)). Turning to the words themselves, the majority concludes that "advice" can only be "received" because *Bergan* defined "advice" to include "an opinion or recommendation offered as a guide to action." Maj. Op. at 16 (quoting *Bergan*, 196 Ga. App. at 80). The majority reasons that because the

36

definition of "advice" includes the word "recommendation," it would be redundant if "advice" could be "recommended." *Id.*

In doing so, the majority ignores that the meaning of a word is dependent upon the context in which it is used. *See Scrocca v. Ashwood Condo. Ass'n, Inc.*, 326 Ga. App. 226, 229 (2014) ("[W]ords are given meaning by their context." (internal quotation marks omitted)). *Bergan* did not define "advice" in the context of a policy for which advice could be "recommended or received"—the policy in *Bergan* excluded coverage only for conditions "for which . . . advice was received." 196 Ga. App. at 79. Further, although the majority relied on context to reach its definition of "diagnosis," it rejects doing so to define "advice." Moreover, the majority ignores the fact that Georgia courts recognize that "advice" can be "recommended." In *White v. American Family Life Assurance Company*, the Georgia Court of Appeals dealt with a policy that provided coverage for certain conditions "for which . . . medical advice . . . was recommended or received." 284 Ga. App. 58, 62 (2007). Unsurprisingly, the court acknowledged that conditions would be covered if they were conditions "for which a physician had *recommended* or given advice" and met the policy's other requirements. *Id.* at 63 (emphasis added).[6]

---

[6] And it is not just Georgia courts to which I cite. Our sister circuit's decision in *LoCoco v. Medical Savings Insurance Co.*, 530 F.3d 442 (6th Cir. 2008) is in harmony with my take on this case. In *LoCoco*, the Sixth Circuit addressed a functionally identical provision that excluded

37

This makes sense. If a patient sees a doctor for an evaluation and the doctor later mails the patient his advice on how to treat the condition, the doctor's letter can be said to be recommending "advice"; when the patient gets that letter and reads it, he has received the "advice." Similarly, the other items listed in § (A) ("advice," "care," and "treatment") can be both "received" and "recommended." The same goes for "diagnosis." "Diagnosis" can just as easily be "recommended" as "advice," "care," and "treatment" can, as this case illustrates.

Finally, the majority says that even if "diagnosis" unambiguously refers to diagnostic procedure, then § 5(A) still does not apply because Jones's April mammogram was not "a diagnostic procedure intended to ascertain an unknown 'condition.'" Maj. Op. at 20. But that misframes the issue; the April mammogram does not have to be, itself, a diagnostic procedure for § 5(A) to apply. Dr. Bauer's report just needs to recommend diagnosis. And the report does precisely that: it "recommended" diagnosis because the report stated that Jones "[n]eed[ed] additional evaluation" and recommended "[s]pot magnification views in the right XCCL and right ML should be performed" and "possibl[y] [a] right breast ultrasound." In other words, the April mammogram recommended that Jones undergo diagnostic procedures to identify what her calcifications were.

---

coverage for any condition "for which medical advice, diagnosis, care, or treatment . . . was recommended or received." *Id.* at 446. The Sixth Circuit held that, although "diagnosis" had two meanings, the policy at issue "clearly refer[red] to a diagnostic procedure." *Id.* at 447 n.1.

The majority's additional suggestion that Jones's calcification were not a "condition" is similarly unavailing, as the record indisputably establishes that her calcifications were cancer.  Dr. DuBois testified that "the mammogram in April of 2014" indicated that Jones's doctors "need[ed] more information" about Jones's calcifications and that those "calcifications . . . . w[ere] the same condition as the cancer" Jones was eventually diagnosed with.  Lest there be any doubt, Dr. DuBois also agreed that "the calcifications seen on the April 16th, 2014 mammogram [were] really the malignancy, the malignant neoplasm of the breast that was eventually diagnosed."[7]

Even if Dr. DuBois's testimony was not clear that the April mammogram recommended diagnosis of Jones's breast cancer (manifested at the time as calcifications), the majority inappropriately resolves what is then an issue of fact by granting summary judgment to Jones.  If there is some ambiguity in the record or conflicting testimony from Dr. DuBois whether Jones's calcifications were her cancer, then that is a question of fact that cannot be resolved on summary judgment.  *See Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) ("If any fact issues exist a trial judge must

---

[7]  Dr. DuBois made the same point even in the portion of his deposition selectively quoted by the majority:  that the calcifications "w[ere] an abnormality that suggested the possibility of a cancer[ ]  [a]nd ultimately it was a [sic] cancer," and were "part of the cancer" in that they were "related to the metabolism of the cancer."

not make findings but is required to deny the motion and proceed to trial." (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983))).

For this reason, even if Dr. Bauer's report did not recommend "diagnosis," it at least recommended "advice" about what Jones should do regarding her calcifications. As discussed earlier, *Bergan* held that a doctor's guidance to seek further diagnostic testing and evaluation constitutes "advice." 196 Ga. App. at 80.

In short, I conclude that Jones had a preexisting condition as defined in § 5(A) of the Policy. In reaching this conclusion, I note that it would be impossible not to feel sadness about Jones's illness and empathy for the severe financial ramifications she has suffered. At the same time, Jones, who is both a nurse and an experienced lawyer, knew that she had had a mammogram over two months prior to her application for a health insurance policy containing a very broad preexisting-condition exclusion. She further knew that she had not obtained the results of that mammogram at the time she applied for the insurance. That she had unsuccessfully tried on more than one occasion to obtain the report should not have inspired optimism on her part or confidence that she could evade a preexisting-condition clause by remaining ignorant.

This is not a case in which there was some secret diagnosis hidden in a doctor's files. Jones knew she had undergone the procedure and that there was an answer as to the results of this procedure. Prudence dictated that she obtain that

40

answer before she signed onto a policy that might exclude coverage based on the results of that test and any recommendations it might contain.  Certainly, Jones was able to obtain those results after she had enrolled with Golden Rule; there was nothing to prevent her from doing so prior to enrolling.  In the end, I simply, but respectfully, disagree with the majority's conclusion that § 5(A) is not applicable here.  Thus, I dissent as to the reversal of summary judgment on this provision.

## B.    The *Nostra Sponte* Granting of Summary Judgment to Jones

I strongly disagree with the majority's decision to grant summary judgment to Jones when she never moved for summary judgment below and did not request it on appeal.  Maj. Op. at 23–25.

First, an insured has the burden to show an entitlement to coverage. *Travelers Home and Marine Ins. Co. v. Castellanos*, 297 Ga. 174, 176–77 (2015). Whether Jones is entitled to coverage, however, has never been briefed by the parties—in the district court or on appeal—and the majority offers no explanation for why it believes she is inevitably entitled to coverage.  Even assuming that her condition is not excluded under § 5(A), that alone does not establish her entitlement to coverage.  By granting Jones summary judgment, the majority reverses the burden of proof, grants relief that Jones never asked for, and essentially takes up the mantle as Jones's counsel.  Clearly, Jones is represented by

41

able counsel who could have requested summary judgment below, but did not do so.

Second, the cases relied upon by the majority for the proposition that an appellate court may enter summary judgment *nostra sponte* emphasize that "[s]ummary judgment will not be awarded to the non-moving party . . . where . . . the moving party has not been given a full and fair opportunity to dispute the facts alleged by his adversary." *E.C. Ernst, Inc. v. Gen. Motors Corp.*, 537 F.2d 105, 109 (5th Cir. 1976); *see also Albino v. Baca*, 747 F.3d 1162, 1177 (9th Cir. 2014) (en banc) ("[Courts] should not reverse a summary judgment and order judgment for a non-moving party based on an issue that the movant had no opportunity to dispute in the district court." (quoting *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 495 (9th Cir. 2000)). Yet here the parties have not briefed—before this Court or the district court—whether Jones is entitled to coverage.

As to whether Dr. Bauer's May report constitutes "advice," which would exclude coverage of Jones's breast cancer, Golden Rule raised this argument before the district court in its motion for summary judgment, but the district court did not address it. Though Golden Rule did not raise this argument again in its brief, Golden Rule had no obligation to because it was not raised in Jones's initial brief. In fact, Jones argued in her initial brief that "th[e] Court need not consider whether the April 16, 2014 mammogram constituted 'advice'" because "the

42

question [on appeal] [wa]s solely whether the April 16, 2014 mammogram was a 'diagnosis.'" The majority's unilateral grant of summary judgment incentivizes appellees to include any and every argument they can in their opposition briefs, even for issues that the appellant concedes are not before the Court on appeal, for fear that this Court may reverse and grant summary judgment to the nonmoving party.

Golden Rule likely expected that the outcome of this appeal would be, at worst, a reversal of the district court's summary judgment order and a remand to decide the remaining issues. Given that is how most appeals work, this certainly was not an unreasonable expectation. Moreover, we don't know what we don't know, and we cannot discern what impact our *nostra sponte* grant of summary judgment to Jones might have on other issues in this case.

Respectfully, I dissent.

43